**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOCAL UNION NO. 313, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL-CIO, Respondent.**

No. 12385.

United States Court of Appeals Third Circuit.

Argued March 4, 1958.

Decided April 17, 1958.

Arnold Ordman, Washington, D. C. (Jerome D. Fenton, General Counsel, Stephen Leonard, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Ruth V. Reel, Attorneys, National Labor Relations Board, Washington, D. C., on the brief), for petitioner.

Joseph Donald Craven, Wilmington, Del., for respondent.

Before GOODRICH, McLAUGHLIN and KALODNER, Circuit Judges.

GOODRICH, Circuit Judge.

This is a petition by the Labor Board for an enforcement order in a secondary boycott case. The Board has found that the respondent has violated section 8(b) (4) (A)[1] and (B) of the Taft-Hartley Act, 29 U.S.C.A. §§ 158(b) (4) (A), (B),[2] and rendered an enforcement order accordingly, 1957, 117 N.L.R.B. 437. There are two parts to the case. One has to do with the application of the law to the facts. The other is a pure question of law and involves the question of interpretation of the statute.

The basic facts are not disputed and need not be discussed in great detail since we think they support the conclusions reached by the Board. Shortly stated this is what happened. The New Castle County Airport Commission received bids for the construction of an airport passenger terminal in New Castle County, Delaware.[3] Contracts were awarded to W. D. Haddock Construction Co., Inc. (Haddock) for general construction; Bateson, Inc. for plumbing, heating and so forth; and Peter D. Furness Electrical Co. (Furness), for the electrical work. The first two firms were union contractors. Furness was not. A labor representative suggested to the Airport Commission before final decision was made that there was a "great possibility of trouble developing on the work" if Furness was given the contract. Nevertheless, Furness did get the contract as the lowest bidder. Construction began on the site December 14, 1954. By February 1st the work had reached a stage where Bateson was waiting for further construction before it could complete its plumbing and heating work. Furness, whose employees had worked on electrical installations for two days in December, was likewise waiting for the steel structure to be erected before it could go to work on the major part of its electrical contract.

The electrical workers set up a picket line on February 2nd, 1954. At that time no Furness employees were working on the job nor were they expected for some time. The pickets carried signs of which we were shown facsimiles. They an-

---

1. Specifically, the respondent's activities were found to have had the following objects unlawful under this subsection: (1) forcing transportation firms, subcontractors, suppliers and materialmen to cease doing business with Haddock and Bateson; (2) forcing transportation firms and subcontractors to cease doing business with the suppliers, materialmen, and subcontractors of Haddock and Bateson; (3) forcing Haddock and Bateson to cease doing business with the County; and (4) forcing the County to cease doing business with Furness.

2. Sections 8(b) (4) (A) and (B) of the Act make it unlawful for a union " * * to induce or encourage the employees of any employer to engage in * * * a concerted refusal in the course of their employment * * * to perform any services, where an object thereof is: (A) forcing or requiring any employer or * * * other person * * * to cease doing business with any other person;" or "(B) forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 9. * * *"

3. No jurisdictional question is involved in this case.

nounced in general terms that the job was being picketed by L.U. 313 "For The Purpose of Authorization" and so forth. On one of the signs under the word "workers" in large type was handwritten "of Peter D. Furness Electrical Co." in comparatively small script. It was in evidence that various employees of subcontractors and transportation firms were, one at a time, turned away from the gate to the premises where the construction was to be carried on. At one time two employees bringing a piece of machinery were likewise turned away by the pickets.

█ The Union earnestly contends that the evidence was insufficient to justify a violation of this statute. It says that there was, within the meaning of section 8(b) (4), no inducement of "employees of any employer" to engage in "concerted action." We think we have already substantially covered this contention by our decision in Schauffler for and on Behalf of N. L. R. B. v. United Ass'n of Journeymen, etc., Local 420, 3 Cir., 1956, 230 F.2d 572, 574. That decision is supported by Amalgamated Meat Cutters and Butcher Workmen of North America, AFL, Local 88 v. N.L. R.B., 1956, 99 U.S.App.D.C. 24, 237 F.2d 20, 23–24, certiorari denied, 1957, 352 U.S. 1015, 77 S.Ct. 556, 1 L.Ed.2d 545. Furthermore, we think that the Board's findings that these activities were for the enumerated illegal purposes are fully sustainable.

### The Law Question.

This is a novel and interesting problem. The Board, by a divided vote, found that two of the unlawful purposes of the picketing were to force the other prime contractors to cease doing business with the County and the County to cease doing business with Furness. To reach this result the majority members were required to conclude that the County was a "person" and, therefore, entitled to protection from the activities proscribed by Section 8(b) (4) (A).

It is to be noted that we are not here concerned with the question whether a municipal subdivision is an employer within the meaning of the statute. We take it that the County was not an employer at all but simply a contractor. In any event, Section 2(2) of the Act, 29 U.S.C.A. § 152(2), in defining the term employer specifically excludes the state or political subdivision.

Section 2(1) of the Act, 29 U.S.C.A. § 152(1), defines person:

"The term 'person' includes one or more individuals, labor organizations, partnerships, associations, corporations, legal representatives, trustees, trustees in bankruptcy, or receivers."

The Board, up until this order, has been of the view that political subdivisions could not be considerd as persons for the purpose of section 8(b) (4) (A). The Board thought that the omission of reference to political subdivisions in section 2 showed an intent to exclude them from the term person. More convincingly, the Board reasoned that Congress had legislated a plan of correlative duties attaching to both employers and employees. This correlative plan would be undercut if a political subdivision could receive the protection of section 8(b) (4) (B) and (A), as a person, while remaining immune from charges filed against it on the ground that it was not an employer. These views are well set out in Al J. Schneider, 1949, 87 N.L.R.B. 99, rehearing denied, 1950, 89 N.L.R.B. 221, and Sprys Elec. Co., 1953, 104 N.L.R.B. 1128. These two decisions were thoroughly reviewed by both the majority and dissenting members of the Board in the instant case.

The basis on which the Board changed its mind was the Supreme Court's decision in Local Union No. 25, International Brotherhood of Teamsters, etc. v. New York, N. H. & H. R. Co., 1956, 350 U.S. 155, 76 S.Ct. 227, 231, 100 L.Ed. 166, known as the "piggy-back" case. It appeared that the Union had induced employees of the transportation firm to cease delivering trailers to the railroad flatcars with an object of forcing the firm to cease doing business with the railroad in this way. The railroad went

to the Massachusetts courts for relief and got it. But upon review the Supreme Court said that the National Labor Relations Board and not the state court had jurisdiction. The Supreme Court used this language:

"We think it clear that Congress, in excluding 'any person subject to the Railway Labor Act [45 U.S.C.A. § 151 et seq.]' from the statutory definition of 'employer,' carved out of the Labor Management Relations Act the railroads' employer-employee relationships which were, and are, governed by the Railway Labor Act. But we do not think that by so doing Congress intended to divest the N. L. R. B. of jurisdiction over controversies otherwise within its competence solely because a railroad is the complaining party. Furthermore, since railroads are not excluded from the Act's definition of 'person,' they are entitled to Board protection from the kind of unfair labor practice proscribed by § 8(b) (4) (A)."

Is the Board right in concluding that this action by the Supreme Court and the language used calls for a re-examination of the question whether political subdivisions are persons within the act? The Board thought so even though such a position breaks into the logical correlative rights and duties theory which the Board had followed before. The "piggy-back" case concerned a railroad rather than a municipal subdivision but the Supreme Court's calling attention to the fact that a railroad was not "excluded" from the Act's definition of person would seem to apply equally well to a governmental subdivision even though its employee relationships are not governed by a separate enactment as are the railroads'.

■ A governmental subdivision has no rights of its own; it is only an arm for carrying out the interest of the general public. If some individual or group of individuals has indulged in what the Congress has termed to be an unfair labor practice by which such entity is

harmed we see no objection to the public interest being served by stopping the practice although not otherwise subjecting the municipal subdivision to the statutory obligations of an "employer." In other words, the majority of the Labor Board took the point of view consistent with recognized public policy.

The point is not sun clear. There is no established authority on which to proceed; the answer depends first, upon the question whether the Board has been right before and, second, on the question of whether the "piggy-back" case gives authority for the position the Board now takes. We think it does.

The order of the Board will be enforced