**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOCAL 254, BUILDING SERVICE EMPLOYEES INTERNATIONAL UNION, AFL–CIO, Respondent.**

**No. 6626.**

United States Court of Appeals
First Circuit.
April 10, 1967.

---

Elliott C. Lichtman, Washington, D. C., with whom Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Paul Elkind, Atty., Washington, D. C., were on petition for adjudication in civil contempt, for petitioner.

Harold B. Roitman, Boston, Mass., for respondent.

Before ALDRICH, Chief Judge, Mc-ENTEE, and COFFIN, Circuit Judges.

ALDRICH, Chief Judge.

This is a petition to hold a union in civil contempt for violations of a Labor Board order which we enforced following our opinion in NLRB v. Local 254, Building Service Employees International Union, AFL–CIO, 1 Cir., 1966, 359 F.2d 289. Before stating our findings, we will recite the basis for that order. Local 254, the union, represents employees of contract cleaners, who are persons engaged in furnishing building cleaning and janitorial services, after hours, to industrial and other concerns. One Kletjian, a contract cleaner doing business as University Cleaning Company, at one time had a collective bargaining agreement with the union, but upon his employees disassociating themselves therefrom the contract was not renewed. The Board found that (in some undetermined respect) the union and University had an existing labor dispute. Concededly, some of University's employees do not receive all the benefits that the union has obtained from some other cleaners.

In March and April, 1963, the union apprised the United Airlines' Boston office, which employed University, that University was nonunion, was undermining wage rates, and was destroying the union's "public image." When United did nothing, the union threatened to picket, and did. The two pickets carried signs saying, "The contract cleaners employed here are not members of Local 254, AFL–CIO." They engaged in no physical obstruction, or even in conversation. The picketing occurred during United's business hours, and never while employees of University were on the premises. After two weeks it stopped. Essentially the same pattern was followed at the place of business of an A & P grocery store in Boston, another of University's customers.

In resisting the Board's finding that this was a violation of the act the union phrased as its principal point on review, "Whether picketing which is limited to informing the public that cleaners employed at a location are nonunion is in violation of Section 8(b) (4) (ii) B of the Act." It argued to us that the "picketing activities * * * were limited to informational acts," and that the union "was following the specific product, University cleaning service, to the appropriate locations * * * where University operated and where the public could be alerted to the facts." For this it cited NLRB v. Fruit and Vegetable Packers (Tree Fruits), 1964, 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129. We held the reliance misplaced, and agreed that the Board's finding of forbidden conduct directed towards University's customers was warranted. The order that we enforced forbade, "threatening, coercing or restraining United Airlines, The Great Atlantic & Pacific Tea Co., or any other person similarly engaged in commerce or in an industry affecting commerce, where an object thereof is to force or require them to cease doing business with Herbert Kletjian d/b/a University Cleaning Co."

The present petition alleges that beginning in August 1966 the union had engaged in essentially the same conduct directed towards two other customers of University, Craftsman Life Insurance Co. in Boston, and and Lewis Shepard Products Co. in Watertown, both of which are in interstate commerce. The union admitted certain conduct, but asserted what it claimed to be distinguishing dissimilarities. The asserted dissimilarities, and our findings with respect to them based upon evidence presented in open court, are as follows:

(1) The union did not notify Craftsman or Lewis Shepard in advance that University was nonunion, or that it intended to picket, and had no conversations with them at any time. We find this to be true, but immaterial. Picketing may still be threatening even though it is carried on without notice, or in silence. The party whose place of business is picketed does not need to be told orally what it can read on the picket signs or reasonably infer therefrom.

(2) The union did not picket at all. This contention we reject entirely. There is some small conflict in the testimony as to what the sign carriers actually did, whether or not they were "patrolling," but it is agreed that they stood and sometimes walked in front of the entrances of Craftsman and Lewis Shepard, carrying signs and handing out leaflets. This unquestionably was picketing. NLRB v. Local 182, Int'l Bhd. of Teamsters, 2 Cir., 1963, 314 F.2d 53.

(3) Respondent's principal contention is that its conduct was not directed against Craftsman and Lewis Shepard, but was intended to inform potential customers of University that it was nonunion. In reply to the natural query why, if that was the objective, the union chose to picket secondary plants and not University itself, union officials said they thought it likely that potential customers of University might visit these secondaries to check University's work.

We find this contention a transparent afterthought. Although University did sometimes furnish the names of current customers to potential customers, it suggested no inspection, and there was no

evidence that any inspection was ever made at Craftsman, Lewis Shepard, or anywhere else.[1] The pickets appeared during the business hours of the secondaries, not when University employees were working. That a union would detail two men to spend full days at commercial establishments in order to contact a possible person who might come there to follow up work references strains credulity.

We might add that we think it far more likely, if the union was thinking of prospective customers of University at all, that it thought of them in *in terrorem* terms, viz., that it was informing them that if they employed University they, too, could expect to be the object of secondary picketing. Since such future picketing would itself be forbidden by our order, obviously this could not be a protected informational activity.

The union's suggestion that its signs themselves indicated that there was no dispute with the picketed secondaries must also be rejected. The signs (and the leaflets that were handed out) read as follows:

"Unfair

University Cleaning Company is an unfair cleaner.

University Cleaning Company does not meet the union standards.

Lewis Shepard Products Inc. Watertown, American Electroplating Co., Harding Gross Inc., Seal-Rite of Cambridge and Craftsman Insurance, Boston are using the services of this unfair cleaner.

This statement is directed to customers and the public only. It is not a request to employees to refuse to pick up, deliver, or transport or refuse to perform any services.

S.E.I.U. Local 254 AFL–CIO"

We do not read the sentence, "This statement is directed to customers and the public only." as an assertion that it is directed to customers of University. Coming as it does immediately after the listing of the concern whose premises are being picketed, we read it, rather, as directed to the customers of that concern, just as, admittedly, the sentence following quite obviously refers to the employees of that concern.

If a sign could change the character of respondent's conduct so as to relieve it from the consequence of an order, certainly this one did not. We find the union's activities at Craftsman and Lewis Shepard to be clear and intentional violations.[2]

We turn to a further matter, which occurred since the present petition was filed and was introduced by amendment. On January 12, 1967 the Massachusetts Department of Education opened bids for contract cleaning services at a building that it was about to occupy, and it appeared that University had submitted the lowest qualified bid. On the following day officials of the union called upon an officer of the Department and asked that University not be awarded the contract. Shortly thereafter, and before any award had finally been made, pickets appeared at the main entrance of the building that then housed the Department carrying signs saying, "Mass. Department of Education Policies Unfair to Local 254, AFL–CIO." The Board has asked us to find this picketing in violation of the order to cease threatening, coercing, or restraining "any other person similarly engaged in commerce" where an object thereof is to force or re-

1. We disregard, as *de minimis*, testimony that came, incidentally, from Kletjian, not the union, of a single inspection that took place four years before.

2. This being a civil contempt, actual intent is immaterial. However, the defense was so insubstantial, the union's principal witness even contradicting his own affidavit by which summary judgment had been resisted, that we believe we should take notice of the fact.

quire such secondary employers to cease doing business with University.

▇▇ That the Department of Education is a "person engaged in Commerce" we have no doubt. One purpose of the 1959 amendments to section 8(b) (4), which substituted the language "any person engaged in commerce" for "any employer," was to bring within the coverage of the section activities against entities such as railroads and governmental units, which are specifically excluded from the act's definition of "employer." See, e. g., S.Rep.No.187, 86th Cong., 1st Sess. (1959) at 80, in 1 Legislative History of the LMRDA 397, at 476, U.S.Code Cong. & Admin.News 1959, p. 2318. Hence the Department seems clearly a "person." Furthermore, it purchases substantial quantities of goods produced in other states, and hence enters the flow of commerce. See, e. g., NLRB v. Baker Hotel of Dallas, Inc., 5 Cir., 1963, 311 F.2d 528, 529.

Whether the union picketing of the Department violated the Board's order is another matter. There are two complicating factors. In the first place, the words "threaten, coerce, or restrain," apparently have never been defined where the object is a public agency. The Department of Education has no customers. The appeal might be found to have been only to officials of the Department and the general public. Secondly, we do not find the objective of this picketing entirely clear. The union claims that procedures used in choosing the contract cleaners who would be asked to submit bids, and the Department's policy of not requiring contractors to comply with any minimum wage and benefit standards, were unfair to it. At least taken by themselves these might be matters in legitimate, primary dispute between the union and the Department. On the other hand, these questions were raised only when the award of a contract to University was imminent, and this award was concededly, at least in part, what the union was attempting to prevent.[3]

▇▇ We do not view this as a purely factual matter. Clearly we have jurisdiction, cf. NLRB v. Bird Machine Co., 1 Cir., 1949, 174 F.2d 404, 406, so that naked principles of primary jurisdiction, see, San Diego Bldg. Trades Council, etc. v. Garmon, 1959, 359 U.S. 236, 242–243, 79 S.Ct. 773, 3 L.Ed.2d 775; Garner v. Teamsters, etc. Union, 1953, 346 U.S. 485, 490–491, 74 S.Ct. 161, 98 L.Ed. 228; Myers v. Bethlehem Shipbuilding Corp., 1938, 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 do not apply. Nevertheless the principle announced in the primary jurisdiction cases, that important questions of statutory interpretation should be considered first by the Board, which has the major and initial responsibility for enforcing the act, seems applicable here in our discretion.

The question whether section 8(b) (4) prohibits picketing designed to elicit a public response to the actions of a government agency with which the union may have both a primary and a secondary dispute is of particular importance. The farther that picketing recedes from "isolated evils" and the closer it comes to the guarantees of the First Amendment, see Tree Fruits, supra, 377 U.S., at 63, 84 S. Ct. 1066, the more cautious we must be. Finding that the Department picketing raises possibly difficult and substantially different questions from those raised by the conduct that led to the Board's order, we decline to hold the union in contempt so far as this picketing is concerned.

This action is intended to be without prejudice to any future Board action, in the ordinary course, to determine whether the Department activity violated section 8(b) (4). Furthermore, it is not in recognition of the union's general claim that we can never find it in contempt until the Board has first exhausted its administrative procedures. In the normal course the court must be able to, and will,

---

3. Cases such as NLRB v. Local Union No. 313, Int'l Bhd. of Electrical Workers, AFL-CIO, 3 Cir., 1958, 254 F.2d 221, which did involve a public agency, related to coercion in an established sense—urging employees and deliverymen not to cross the picket line—and involved the agency only as a secondary employer.

proceed directly to enforce its own decree. NLRB v. Bird Machine Co., supra; NLRB v. M. Lowenstein & Sons, Inc., 2 Cir., 1941, 121 F.2d 673, 674; see also NLRB v. Reed & Prince Mfg. Co., 1 Cir., 1952, 196 F.2d 755, 760. Any other result would mean that even flagrant violations of an existing order could go unpunished.

■ With respect to the Craftsman and Lewis Shepard matters the union is to be adjudged in contempt. It may purge itself by making reimbursement to the Board for all proper costs and expenses, including salaries, West Texas Utilities Co. v. NLRB, 1953, 92 U.S.App. D.C. 224, 206 F.2d 442, cert. den. 346 U.S. 855, 74 S.Ct. 70, 98 L.Ed. 369, incurred in the preparation and prosecution of this petition, but not of the amendment, the amount thereof to be referred to this court for determination and supplemental decree only in the event of disagreement between the parties. NLRB v. Republican Publishing Co., 1 Cir., 1950, 180 F.2d 437.