NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

TWIN CITY CARPENTERS DISTRICT
COUNCIL, Respondent.

No. 19561.

United States Court of Appeals,
Eighth Circuit.

Feb. 6, 1970.

Angelo V. Arcadipane, Atty., N.L.R.B., Washington, D. C., for petitioner, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Nancy M. Sherman, Atty., N.L.R.B., on the brief.

Willard L. Converse, of Peterson, Bell & Converse, St. Paul, Minn., for respondent, Erwin A. Peterson, on the brief.

Before VOGEL, BLACKMUN and BRIGHT, Circuit Judges.

BRIGHT, Circuit Judge.

In this case respondent Twin City Carpenters District Council (the Union), which bargains for and represents carpenters, cabinet makers and millworkers union locals in the Minneapolis-St. Paul (Twin Cities) area, directed the picketing of a general housing contractor, Pemtom, Inc. and its affiliated corporation, Pemble-Thompson, Inc., (Pemtom) with a sign declaring: "NOTICE TO PUBLIC—Cabinets being installed on this job were not made by members of the United Brotherhood of Carpenters and Joiners of America—TWIN CITY CARPENTERS DISTRICT COUNCIL". Pemton's continuing purchases of ready-to-hang, pre-assembled wooden cabinets for kitchens and bathrooms from Red Wing Wood Products, Inc. of Red Wing, Minnesota, (Red Wing) precipitated the picketing, which in turn generated unfair labor practice charges pressed by Red Wing and the non-carpenter unions which represent Red Wing's employees alleging the Union to be guilty of an unlawful secondary boycott in violation of § 8(b) (4) (ii) (B) of the National Labor Relations Act.

The Board sustained these charges in a decision reported at 167 N.L.R.B. No. 151 (1967). Pursuant to § 10(e) of the Act as amended (29 U.S.C. § 160(e)),

the Board here seeks enforcement of its cease and desist order directed to the Union. We grant enforcement.

The genesis of this dispute lies in the objection by unions affiliated with the United Brotherhood of Carpenters and Joiners of America to competition from labor, unaffiliated with the brotherhoods, which produced wood products for the Twin City market.

Pemtom constructed approximately 1,200 dwellings at three housing projects known as Oakmount, Park Hills and River Hills in the suburban Twin Cities area between 1963 and 1966. It subcontracted all work on the homes except carpentry and its carpenters, affiliated with respondent, installed the pre-assembled cabinets in question. During the 1963–1965 period, the Union's representatives on several occasions urged Pemtom to purchase its wooden cabinet requirements from locally "recognized" manufacturers whose product carried the Brotherhood Union Label.[1] The Union claimed Red Wing failed to pay its "farmer" employees a normal living wage and consequently it possessed a competitive advantage over local manufacturers who paid union scale. In 1965, Union representatives suggested that if Pemtom continued purchasing cabinets from Red Wing it should make an effort to convince Red Wing to "organize under the right label".[2] Pemtom's management responded to the Union suggestions by discussing the subject of union organization with Red Wing's president. In late May of 1966,[3] Red Wing's production and maintenance personnel terminated their relationship with the independent union which had been representing them and organized under the banner of Boot & Shoe Workers Local 527–C and Teamsters Local 160. About two months later, respondent Union commenced picketing Pemtom utilizing a single picket who appeared at the parking lot adjacent to Pemtom's sales offices at one or another of its three model-home construction sites each week Monday through Saturday[4] between 8:00 a. m. and 4:30 p. m., the identical hours worked by Pemtom's carpenters and other laborers. No picket appeared during hours of primary sales activities, evenings and Sundays.

At an August meeting, Pemtom requested the Union to cease picketing the construction sites. The Union business representative responded: " * * * [W]e do not recognize Boot & Shoe Workers building cabinets and selling them in Minneapolis and St. Paul". He advised that picketing would end when Pemtom stopped buying from Red Wing.[5] The Trial Examiner categorized

---

1. At that time, Pemtom purchased both Red Wing and Dura-Supreme cabinets. The Minnesota State Council of Carpenters and Joiners, with whom respondent Union is affiliated, circularized a "we do not patronize list" which contained the names of several companies who manufactured cabinets, fixtures, millwork, flooring and other wood-related products, including Red Wing and Dura-Supreme products. Pemtom ceased using Dura-Supreme units prior to the picketing incidents in this case.

2. During 1964, the Minnesota State Council had unsuccessfully attempted to organize Red Wing's workers.

3. Later relevant events occurred in 1966.

4. The Union discontinued picketing activity on Saturdays in mid-September on Pemtom's request and discontinued all

picketing in mid-December pending disposition of this litigation.

5. The testimony of Pemtom's marketing manager relating to his August meeting with Howard Christianson, the Union's business manager, illustrates Pemtom's frustrations in attempting to avoid being picketed:

"Q. All right. Will you please, as carefully as you can, give us the things that were said at this meeting, telling us what Mr. Christianson said and what you said? How did the meeting begin?

A. I guess the meeting opened and I asked Howard what the problem was and he said, 'You know what the problem is.' I consequently got into a discussion on the picketing, and I really

Red Wing as occupying a status of a primary employer and Pemtom as a neutral or secondary one. His crucial finding, approved by the Board, reads:

"Inasmuch as the picketing was not sufficiently identified with, or limited to, the operations of the primary employer to constitute primary activity, but was designed to inflict injury on the secondary employers' business generally, for an object of forcing or requiring neutral employers to cease using the product of another producer, or manufacturer, in order to force or require the secondary employer to cease using the products of, or doing business with, the primary employer, I find that Respondent did threaten, restrain, and coerce Pemtom within the meaning of Section 8(b) (4) (ii) (B) of the Act."

Respondent Union opposes enforcement of the Board's order urging:

█ (1) That the Board lacked jurisdiction since no labor dispute existed between any of the parties to the controversy, and

wanted to know why we were picketed, and my conversation went something like this, that for two or three years Howard and I and the business agents had discussed this problem and one of the alternatives was to see that Red Wing became organized, and as I mentioned, I had conversations with Mr. Keating and a few other people with the Red Wing organization and suggested to them that it is just a matter of time that problems like this are going to happen and they should do something, and they did, they were organized under the Teamsters this spring. Right after that, talking to Howard now, I said, 'As soon as they get organized, bang, we are hit with a sign and a picket. I don't understand why.' He said, 'Well, specifically you are being bannered, picketed, whatever we are going to call it, because we do not recognize Boot & Shoe Workers building cabinets and selling them in Minneapolis and St. Paul. We can't do it.' I asked him, 'Is this not a union problem, it is not my problem? Why use Pemtom as the battleground for the Teamster-Carpenter situation?' He said it had to be that way. He had his directives and if they had to, and if I remember the word right, they will go down the 'tubes' on this one. I was somewhat chagrined again because Riviera does sell cabinets to other builders and no one else was being picketed, and we were having a bad enough year as it was with economic situation, the building situation being hurt bad this summer, not to afford this type of notoriety, I told him we couldn't stand it. I said, 'Let's agree and do something to get it resolved.' Mr. Christianson said they were represented by the Teamsters now, the Teamsters will have to make the first move, let's get this thing resolved. * * * So again I was worrying about production a little bit, asked him if this meant that the Carpenters would be informed that they should not install this cabinet, and he said no, that will not be the case, and he said, 'nor should your deliveries or what have you, this is an informational picket, strictly legal.' And I said, 'We will have to prove it to get the picket off of our parking lot?' He said, 'You are correct. If, on the other hand, anyone stops working or refuses to cross that banner line, you call me right away because we will get this straightened out.' He was emphatic about this, that we would continue. I suggested to him, 'Fine, I think I get the drift of what you are trying to prove, but you are doing it at Pemtom's expense and we are involved in our sales, in a highly organized labor market, we sell homes to laboring people in some of our areas, in all of our areas, and I don't know, I couldn't suggest how important that banner would be to the buying public.' I was afraid they would not buy from us and I told Howard this. It suggested that something was wrong with Pemtom and for the life of me I didn't understand it, what was wrong, why we should be suggested as the scapegoat. * * *
Q. Did you make a specific inquiry of Mr. Christianson concerning what could be done to end the picketing?
A. Naturally I did because I was concerned, I asked him, 'What do you want me to do?' He said, 'Stop buying from Red Wing, No. 1, buy from somebody locally.' This was the theme we had been talking on for three years, it wasn't anything new. This was one way the pickets would be released, stop buying from Red Wing."

(2) That the Board erred in determining the merits of the controversy; the Union's banner truthfully informed Pemtom's customers that cabinets had not been constructed by carpenters affiliated with the Brotherhood and such message constitutes protected consumer picketing under doctrines enunciated in N.L.R.B. v. Fruit & Vegetable Packers & Warehousemen, Local 760, 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964), (*Tree Fruits*), and N.L.R.B. v. Upholsterers Frame & Bedding Workers Twin City Local 61, 331 F.2d 561 (8th Cir.1964) (*Twin City Upholsterers*).

The relevant statute reads:

"It shall be an unfair labor practice for a labor organization or its agents
—

\* \* \* \* \* \*

(4) \* \* \* (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

\* \* \* \* \* \*

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing \* \* \*."
(29 U.S.C. § 158(b) (4) (ii) (B))

In rejecting the jurisdictional attack, the Examiner and the Board relied on National Maritime Union of America. AFL–CIO v. N.L.R.B., 342 F.2d 538 (2d Cir.), *cert. denied,* 382 U.S. 835, 86 S.Ct. 78, 15 L.Ed.2d 78 (1965), and National Maritime Union of America, AFL–CIO v. N.L.R.B., 120 U.S.App.D.C. 299, 346 F.2d 411, *cert. denied,* 382 U.S. 840, 86 S.Ct. 90, 15 L.Ed.2d 82 (1965). In these cases, the National Maritime Union of America, AFL–CIO (NMU), vexed by Marine Engineers Beneficial Association's (MEBA) picketing of a vessel manned by NMU personnel, retaliated by picketing MEBA-manned vessels in several United States ports including those in Philadelphia and New Orleans. Admittedly, NMU bore no grievance against the ships' owners. The court in each case rejected the claim that the Board lacked jurisdiction to determine NMU's alleged unfair labor practices. The Second Circuit noted:

" \* \* \* [B]y affirmative action of its own, [NMU was] seeking to fend off or retaliate for picketing of the S. S. Maximus by MEBA in their continuing warfare to gain or retain the upper hand in representing maritime employees. Several employers and their employees were directly affected. Both the purposes of the Act and the definition of 'labor dispute' are broad and encompass the factual circumstances here presented." 342 F.2d at 541.

The Union relies on N.L.R.B. v. International Longshoremen's Association, 332 F.2d 992 (4th Cir.1964), a case in which the Longshoremen's Union refused to load the "Tulse Hill", an ocean-going vessel, because it had operated in trade with Cuba during the Cuban missile crisis. Judge Sobeloff, writing for the majority, characterized the boycott activity as relating to a "general political question" outside of the purview of the Board's jurisdiction. The facts in *Tulse Hill* range far afield from the instant controversy. The complaint in this proceeding, in statutory language, charged that the Union "threatened", "coerced" and "restrained" Pemtom with the object of forcing Pemtom to cease doing business with Red Wing. These charges relate to no political dialogue but concern a controversy completely indigenous to union activity; one affecting its own members, members of other unions and employers of both.

See, *e. g.*, Allen-Bradley Co. v. Local 3, Int'l Bhd. of Electrical Workers, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945). Section 10(a) of the Act grants the Board jurisdiction to prevent any person from engaging in an unfair labor practice affecting commerce. 29 U.S.C. § 160(a). Though the Union and Red Wing have not engaged in a classic, direct confrontation over terms and conditions of employent or bargaining representation—activities included within the statutory definition of "labor dispute" as contained in § 2(9) of the Act, 29 U.S.C. § 152(9), the Union's objection to Red Wing's employees organizing as Teamsters and Boot & Shoe Workers falls within the general ambit of a labor controversy. The picketing in this case falls within the range of the Board's jurisdiction as established by statute. See National Maritime Union of America, AFL–CIO v. N.L.R.B. (both cases), *supra;* cf. Bedding, Curtain & Drapery Workers Union, Local 140, AFL–CIO v. N.L.R.B., 390 F.2d 495 (2d Cir.), *cert. denied*, 392 U.S. 905, 88 S.Ct. 2056, 20 L.Ed.2d 1363 (1968); N.L.R.B. v. Upholsterers Frame & Bedding Workers Twin City Local 61, 331 F.2d 561 (8th Cir.1964).

■ We next turn to the merits of the Union's contention that it engaged in lawful consumer picketing. The pertinent section constitutes part of the 1959 Landrum-Griffin Amendments to § 8(b) (4) of the Taft-Hartley Act—Labor Management Relations Act, 1947, § 8(b) (4), 61 Stat. 141–142, as amended by the Labor-Management Reporting and Disclosure Act of 1959, § 704(a), 73 Stat. 542–543, 29 U.S.C. § 158(b) (4). These enactments represent a national labor policy curbing secondary strikes and boycotts. See generally National Woodwork Manufacturers Association v. N.L.R.B., 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967); *Tree Fruits, supra;* N.L.R.B. v. Servette, Inc., 377 U.S. 46, 84 S.Ct. 1098, 12 L.Ed.2d 121 (1964); Local 1976, United Brotherhood of Carpenters and Joiners of America,

AFL v. N.L.R.B., 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958) (decided under Taft-Hartley); Bedding, Curtain & Drapery Workers Union, Local 140, AFL–CIO v. N.L.R.B., *supra*; Aaron, Labor-Management Reporting and Disclosure Act of 1959, 73 Harv.L.Rev. 1086 (1960); Cox, The Landrum-Griffin Amendments to the National Labor Relations Act, 44 Minn.L.Rev. 257 (1959). National Woodwork Manufacturers Association v. N.L.R.B., *supra,* tersely summarized the congressional history:

"Labor abuses of the broad immunity granted by the Norris-LaGuardia Act resulted in the Taft-Hartley Act prohibitions against secondary activities enacted in § 8(b) (4) (A), which, as amended in 1959, is now § 8(b) (4) (B). As will appear, the basic thrust of the accommodation there effected by Congress was not expanded by the Landrum-Griffin amendments. The congressional design in enacting § 8(b) (4) (A) is therefore crucial to the determination of the scope of §§ 8(e) and 8(b) (4) (B). Senator Taft said of its purpose:

'This provision makes it unlawful to resort to a *secondary boycott to injure the business of a third person who is wholly unconcerned in the disagreement between an employer and his employees.* * * * [U]nder the provisions of the Norris-LaGuardia Act, it became impossible to stop a secondary boycott or any other kind of a strike, no matter how unlawful it may have been at common law. *All this provision of the bill does is to reverse the effect of the law as to secondary boycotts.*' (Emphasis supplied.)"

386 U.S. at 623–624, 87 S.Ct. at 1257.

In *Tree Fruits,* the majority noted that Congress exhibited concern with "the isolated evil" of using consumer picketing to cut off the business of a secondary employer as a means of forcing him to stop doing business with the primary employer. 377 U.S. at 68, 84 S.Ct. 1063.

The doctrine of *Tree Fruits* and *Twin City Upholsterers* casts no mantle of legitimacy upon the Union's picketing in this case. In *Tree Fruits,* the Union applied indirect pressure against packers and distributors of Washington State apples by picketing supermarkets where the apples were retailed. By its legend on banners carried by the pickets and by information contained in handbills distributed to customers, the Union directly and clearly requested grocer's customers not to buy Washington State apples and explained that its dispute lay with "unfair" producers, not with the particular supermarket. In determining that such activity did not constitute proscribed picketing, the Supreme Court explained:

"We come then to the question whether the picketing in this case, confined as it was to persuading customers to cease buying the product of the primary employer, falls within the area of secondary consumer picketing which Congress did clearly indicate its intention to prohibit under § 8(b) (4) (ii). We hold that it did not fall within that area, and therefore did not 'threaten, coerce, or restrain' Safeway * * *. When consumer picketing is employed only to persuade customers not to buy the struck product, the union's appeal is closely confined to the primary dispute. The site of the appeal is expanded to include the premises of the secondary employer, but if the appeal succeeds, the secondary employers' purchases from the struck firms are decreased only because the public has diminished its purchases of the struck product. On the other hand, when consumer picketing is employed to persuade customers not to trade at all with the secondary employer, the latter stops buying the struck product, not because of a falling demand, but in response to pressure designed to inflict injury on his business generally. In such case, the union does more than merely follow the struck product; it creates a separate dispute with the secondary employer." 377 U.S. at 71–72, 84 S. Ct. at 1071.

In *Twin City Upholsterers,* the Union picketed retail furniture outlets with placards urging that customers buy mattresses produced locally by union labor —a direct appeal aimed at encouraging the purchase of one product over another. We deemed *Tree Fruits* dispositive of the issue raised and disagreed with the Board's finding that such union activity constituted an unfair labor practice.

Whether union picketing calls for a boycott of the secondary employer or a boycott of the primary employer's product depends upon the probable effect of the union appeal upon the consumer. See American Bread Co. v. N.L.R.B., 411 F.2d 147 (6th Cir.1969).

The Board found that the "manner and circumstances [of the picketing] * * * constituted an appeal to prospective customers to boycott Pemtom's houses generally as a means of coercing Pemtom not to buy Red Wing cabinets * * *." This ultimate finding of fact draws ample support from our review of the record as a whole as required by Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Cf. N.L.R.B. v. Carpenters District Council of Kansas City & Vic., AFL–CIO, 383 F.2d 89 (8th Cir.1967).

The Union's banner referred only to cabinets installed on "this job"—Pemtom's. The Union established its locale for this picketing at Pemtom's construction and sales sites. No legend identified Red Wing as the manufacturer nor Teamsters and Boot & Shoe Workers as the Unions representing employees producing the cabinets offensive to respondent. No handbill explained the controversy. The Union instructed its pickets to volunteer no additional information than that carried on the picket's banner. Its appeal omits dissemination of that precise type of information deemed essential in *Tree Fruits* to establish a prod-

uct rather than a general patronage boycott of the secondary business.[6]

Respondent argues that its method of inept, desultory picketing of one site at a time during periods of little sales activity probably reached only a small group of Pemtom's customers (perhaps five to twenty per cent) and could produce no general boycott of Pemtom. It thus claims that its activity produced no coercion within the concept of the statute. We think it immaterial that the Union neglected or declined to engage in more consistent picketing activity at all of Pemtom's construction sites. An appeal of the kind made by the Union requesting that customers, whether few or many, generally boycott Pemtom falls within the statutory ban.[7]

Our conclusion draws support from the results, though not necessarily the rationale, of the following cases: American Bread Co. v. N.L.R.B., 411 F.2d 147 (6th Cir.1969); Glaziers' Local 558 v. N.L.R.B., 132 U.S.App.D.C. 394, 408 F. 2d 197 (1969); Honolulu Typographical Union No. 37 v. N.L.R.B., 401 F.2d 952 (D.C.Cir.1968); Bedding, Curtain & Drapery Workers Union, Local 140, AFL–CIO v. N.L.R.B., 390 F.2d 495 (2d Cir.), cert. denied, 392 U.S. 905, 88 S.Ct. 2056, 20 L.Ed.2d 1363 (1968); N.L.R.B. v. Local 254, Building Service Employees International Union, 376 F.2d 131 (1st Cir.), cert. denied, 389 U.S. 856, 88 S.Ct. 86, 19 L.Ed.2d 123 (1967); N.L.R.B. v. Millmen & Cabinet Makers Union, Local 550, 367 F.2d 953 (9th Cir.1966); N.L. R.B. v. Building Service Employees International Union, Local 105, 367 F.2d 227 (10th Cir.1966); N.L.R.B. v. Local 254, Building Service Employees Inter-

national Union, AFL–CIO, 359 F.2d 289 (1st Cir.1966).

We grant the petition for enforcement of the Board's order.

---

6. On oral argument respondent's counsel suggested that a customer's appropriate response would request that Pemtom install other cabinets in its homes. The Union's message, however, called for no such explicit response. Cf. Tree Fruits, appendix to opinion at 377 U.S. 58, 73–76, 84 S.Ct. 1063; Bedding, Curtain & Drapery Workers Union, Local 140, AFL-CIO v. N.L.R.B., 390 F.2d 495 (2d Cir. 1968) (a generally-worded picket sign fails to isolate a dispute and may constitute an appeal for a general boycott against the neutral and secondary party).

7. We entertain little doubt from the record that the Union's picketing exerted some pressure on Pemtom. See testimony, fn. 5, supra.