657 F.2d 1252
 105 L.R.R.M. (BNA) 2658, 212 U.S.App.D.C. 10,
90 Lab.Cas. P 12,417
 SOFT DRINK WORKERS UNION LOCAL 812, INTERNATIONAL
BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN
AND HELPERS OF AMERICA, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 79-1888.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 30, 1980.
Decided Oct. 3, 1980.
 
 Sidney Fox, New York City, with whom Gerald Richman, New York City, was on the brief, for petitioner. Robert M. Baptiste and Joseph E. Santucci, Washington, D. C., also entered appearances for petitioner.
 Marion Griffin, Atty., N. L. R. B., Washington, D. C., with whom Elliott Moore, Deputy Associate Gen. Counsel, and Jay E. Shanklin, Atty., N. L. R. B., Washington, D. C., were on the brief, for respondent.
 Before WRIGHT, Chief Judge, and WALD and MIKVA, Circuit Judges.
 Opinion for the court filed by Chief Judge J. SKELLY WRIGHT.
 Dissenting opinion filed by Circuit Judge WALD.
 J. SKELLY WRIGHT, Chief Judge:
 
 
 1
 This case presents some difficult issues of labor law arising out of an extremely unusual set of facts. Hoping to reduce a serious loss of its members' jobs at local soft drink plants, petitioner union picketed a retail beverage store to urge customers to buy soft drinks manufactured[1] by these local plants. The National Labor Relations Board issued a cease and desist order against the union, holding that because the picket signs failed to identify precisely the favored local products for customers, the picketing violated Section 8(b)(4)(ii)(B) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(ii)(B) (1976), the so-called "secondary boycott" provision. We affirm the Board's decision and grant its cross-application for enforcement.
 
 I. BACKGROUND
 
 2
 Local 812 of the Soft Drink Workers Union represents employees of firms that bottle, can, and distribute soda in an area consisting of the five boroughs of New York City as well as six New York State counties near the city: Nassau, Suffolk, Westchester, Putnam, Dutchess, and Columbia.[2] Apparently because of the very high cost of doing business in the New York City metropolitan area, the soda manufacturers within the union's jurisdiction began to suffer a serious loss of business in 1977 and 1978, and a great number of union members lost their jobs.[3] Responding to this problem, the union surveyed retail outlets within its jurisdiction and discovered that a substantial amount of the soda sold at retail in and around New York City came from manufacturers outside the union's area.[4]
 
 
 3
 Monarch Long Beach Corporation is a retailer and wholesaler of beer and soda in Nassau County, operating a retail outlet in Long Beach, New York, and a larger wholesale outlet in nearby Island Park.[5] Of the sales at Monarch's retail store, which was the sole object of the picketing, 35 percent were of soda and 65 percent were of beer. In its survey of local outlets the union discovered that Monarch purchased most of the soda at retail from manufacturers outside the union's jurisdiction. Decision of Administrative Law Judge (ALJ) at 4, Joint Appendix (JA) 422 (hereinafter cited only to JA).
 
 
 4
 On Monday, March 27, 1978 members of Local 812 began picketing and distributing handbills in front of Monarch's retail store. The picket signs bore the following legend:
 
 
 5
 To the Consumer,
 
 
 6
 Please Buy Soft Drinks Made Locally.
 
 
 7
 Stop Unemployment Here.
 
 
 8
 Local 812,
 
 
 9
 Soft Drink Workers Union,
 
 
 10
 International Brotherhood of Teamsters.
 
 
 11
 JA 423. The handbills which the picketers distributed to people entering and passing in front of the store read as follows:BUY LOCAL
 
 THANK YOU
 For purchasing a local product
 
 12
 In the past year in the New York Metropolitan Region alone there was a loss of 125,000 jobs and more going.
 
 
 13
 We urge you to save our jobs your neighbors by buying soft drinks manufactured and distributed locally
 
 
 14
 SOFT DRINK WORKERS UNION,
 
 
 15
 LOCAL 812, I.B.T.
 
 
 16
 Id. The union continued the picketing and handbilling seven days a week, the number of pickets ranging from six to 16. JA 423-424, 429. On some days the pickets chanted to the customers such messages as "Be a smart consumer. Keep the tax dollars in New York," JA 424, and "Read the label before you put it on the table," JA 430. Although there was no evidence that the pickets prevented any customers from entering the store or even directly urged customers not to enter, the Board found that some picketers had booed or spoken sarcastically to customers who left the store with soft drinks, or written down their car license numbers, and that some had shouted, "You can save money, shop at Waldbaum's (a nearby supermarket)," JA 424, and "Don't buy scab soda," JA 425. Nevertheless, the Board found that the picketing had been peaceful and rejected Monarch's allegations that the picketers' conduct constituted restraint or coercion of customers or deliverymen. JA 434-437. Monarch responded to the picketing by informing its customers that it would continue to sell nonlocal soft drinks because they were cheaper for both the store and the customers than the local soft drinks. On April 10, 1978 Monarch filed an unfair labor practice charge against the union. On May 5, 1978 the General Counsel issued its complaint.
 
 
 17
 The picketing continued until May 11, 1978, when the Board petitioned the District Court for an injunction under Section 10(l ) of the Act, 29 U.S.C. § 160(l ) (1976), and the union agreed to reduce the pickets to two. The union observed that limit until May 30, when the District Court denied the injunction, JA 452, and the number of pickets increased again. The picketing then continued through the June 1978 hearing before the ALJ and until August 25, 1978, when the New York State Supreme Court issued a preliminary injunction against the union. JA 414. On July 30, 1979 the Board affirmed the findings and conclusions of the ALJ and issued the cease and desist order against the picketing. 243 NLRB No. 126, JA 419-445.
 
 
 18
 The Board recognized that this case does not present a conventional secondary boycott situation, since the union had no face-to-face dispute with any employer over any bargaining or representation issues. JA 431.[6] Nevertheless, the Board found that the nonlocal manufacturers stood in the position of primary disputants with respect to the union and that Monarch was thus a secondary or neutral party. JA 433. Relying on this finding, the Board held that the picketing was subject to the proscription of Section 8(b)(4)(ii) (B).
 
 
 19
 Addressing the pivotal issue in the case, the Board acknowledged that a "buy local" campaign of the sort intended by the union here could escape the prohibition of Section 8(b)(4)(ii)(B) under the doctrine of NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760, 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964), the famous "Tree Fruits" case. Tree Fruits held that a peaceful boycott on the premises of a neutral employer could be legal if it was directed solely at urging customers not to buy products supplied to the secondary employer by an employer with whom the union had a primary labor dispute and thus did not urge on customers a general boycott of the secondary employer's business. Therefore, union activity confined to a "struck product" is not necessarily an illegal secondary boycott.[7] By analogy, the soft drinks which Monarch purchased from nonlocal manufacturers could be a "struck product," and a union picket merely urging Monarch's customers to buy local soda in preference to the nonlocal products could be legal.[8]
 
 
 20
 Nevertheless, the Board held that the union in this case could not benefit from the protection of Tree Fruits because the picket signs had failed to help the consumer identify the "struck product" by distinguishing the local from the nonlocal soda with sufficient clarity. JA 437-439. The Board invoked its own line of cases inferring from Tree Fruits the requirement that the union adequately identify the "struck product." E. g., Local 248, Meat & Allied Food Workers (Milwaukee Independent Meat Packers Ass'n), 230 NLRB 189, 207 (1977).
 
 
 21
 Drawing on "(v)oluminous testimony," JA 427, the Board found the picket signs defective in several respects. First, and perhaps most important, the Board noted that the very term "local" was ambiguous and that neither the picket signs nor the handbills ever defined the term for consumers. JA 437. Presumably, the union meant "local" to include the 11-county area of its jurisdiction, but consumers might have reasonably construed the term as referring to an area within some specific radius of Monarch's store, or as including sections of New Jersey or Connecticut that are normally considered part of the New York City metropolitan area. JA 437-438. And compounding the ambiguity of the term "local" is the great difficulty any sympathetic consumer would have in determining the place of manufacture by examining the design and language of a bottle or can of soda.
 
 
 22
 For example, such major soda brands as Coca-Cola, Pepsi-Cola, and Seven-Up are actually manufactured in a great variety of plants around the nation, but the bottles and cans distributed by these different plants are virtually identical in design, size, and color. JA 427. Though most of these bottles and cans contain some designation of place of manufacture, the Board found that the consumer could be unable to read, much less comprehend, the designation.[9] One Seven-Up can put in evidence bore the message "Distributed by 7-Up Enterprises, A Division of 7-Up USA, St. Louis, Missouri." JA 428. A union business agent, of 13 years experience, testified that he believed the soda in question was manufactured in St. Louis, but another, with 28 years in the industry, testified that he "knew" it came from Paterson, New Jersey. Id. Even the latter agent conceded that some bottles and cans defied all identification. JA 427.
 
 
 23
 Finally, the Board rejected the union's suggestion that a confused customer could always resolve her confusion by entering the store, selecting the bottle or can she wished to buy, examining its designation, if any, and then stepping outside to consult one of the picketers before returning inside to make her purchase. JA 437. In the Board's view, this suggestion not only assumes that all the picketers could make the identification that proved difficult for even experienced union agents, but also violates the principle, established by the Board, that a union electing the strategy of consumer-aimed picketing at a secondary business cannot "shift its burden of struck product identification to the public to which it is appealing for support." Atlanta Typographical Union No. 48 (Times-Journal, Inc.), 180 NLRB 1014, 1016 (1970).II. THE NECESSITY FOR A "LABOR DISPUTE"
 
 
 24
 The striking fact about this case is that the union neither represents nor seeks to represent any employees of Monarch or of the nonlocal soda manufacturers, and so has no conventional labor dispute with either. The union urges us to hold that the absence of a conventional labor dispute here undermines the Board's action. We perceive two parts to this argument, neither persuasive.
 
 
 25
 First, the union appears to make a jurisdictional argument that the Board has no authority to resolve controversies that do not contain a "labor dispute" as defined in Section 2(9) of the Act, 29 U.S.C. § 152(9) (1976):
 
 
 26
 The term "labor dispute" includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee.
 
 
 27
 However, we have rejected the view that Section 2(9) is a jurisdictional requirement. Nat'l Maritime Union v. NLRB (Delta Steamship Lines), 346 F.2d 411, 414-415 (D.C.Cir.), cert. denied, 382 U.S. 840, 86 S.Ct. 90, 15 L.Ed.2d 82 (1965). Rather, we have construed that section as a definitional provision only, designed to ensure uniform meaning to an important phrase that appears frequently and in very different contexts throughout the statute. Id.[10] Thus we think the Board was under no obligation to pause at the threshold to identify a conventional labor dispute in this case. Its task was instead to measure the union's conduct against specific provisions of the Act defining unfair labor practices.[11]
 
 
 28
 The second and more specific part of the union's argument about the requirement of a labor dispute is that the statutory ban on secondary boycotts cannot apply if there is no primary labor dispute to which the challenged union conduct could be secondary. The Board here recognized that the union had no conventional labor dispute with any of the nonlocal suppliers, and indeed there is no evidence that the union had ever even identified these suppliers. See note 4 supra. The only "dispute" the union had with these manufacturers was that they were underselling local manufacturers, but the union has never contended that the nonlocal suppliers had achieved this competitive edge by underpaying their employees, nor was there any evidence that these nonlocal employees were not unionized.
 
 
 29
 Nevertheless, we find ample authority to support the Board's view that it need not identify a "primary labor dispute" to find a violation of Section 8(b)(4) (ii)(B). In Delta Steamship Lines, supra, we squarely rejected the very argument the union advances here. 346 F.2d at 416-420. We noted that although many passages in the legislative history of the statute invoke conventional primary-secondary situations as examples, id. at 416, the very term "secondary boycott" does not even appear in the statute. Id. at 417; see Local 761, Int'l Union of Elec., Radio & Machine Wkrs v. NLRB, 366 U.S. 667, 672, 81 S.Ct. 1285, 1288, 6 L.Ed.2d 592 (1961). The Board and courts do not approach a Section 8(b)(4)(ii)(B) case by attempting to fit the challenged union activity into a categorical box labeled "secondary boycott"; rather, they read the exact language of the section to see if it forbids what the union has done:
 
 
 30
 Certain acts, when done for a specified object, are proscribed. The mere fact that the language of this Section comprehends the familiar patterns of a secondary boycott in the customary sense does not inexorably dictate the conclusion that it excludes all variations from those patterns. Where, as here, act and object fall comfortably within the letter of the statute, the Board's hand is to be stayed only upon a persuasive showing that they are beyond its spirit.
 
 
 31
 Delta Steamship Lines, supra, 346 F.2d at 417.[12] Citing extensively from the legislative history of the original "secondary boycott" provision in the Taft-Hartley Act, Section 8(b)(4), Labor-Management Relations Act, 61 Stat. 141-142 (1947), we noted the intent of Congress to proscribe a broad range of union tactics, including sympathy strikes, boycotts, and jurisdictional strikes, the common denominator of which is "the characteristic that they do not arise out of any dispute between an employer and employees who engage in the activities, or, in most cases, between the employer and any of his employees." Id. at 416 n.8, quoting 1 Legislative History of the Labor-Management Relations Act at 314 (1947).[13] The Second Circuit took the same view of this question in a case involving the very same NMU controversy as our own. Nat'l Maritime Union v. NLRB (Weyerhauser), 342 F.2d 538, 542 (2d Cir.), cert. denied, 382 U.S. 835, 86 S.Ct. 78, 15 L.Ed.2d 78 (1965). And in a case very similar to the one before us the Ninth Circuit upheld a Board finding of illegal "secondary" activity where a union held a work stoppage at a plant buying supplies from Canadian firms whose employees did not belong to the striking union, even though the union had no dispute with the Canadian firms. NLRB v. Washington-Oregon Shingle Weavers' District Council, 211 F.2d 149, 152 (9th Cir. 1954); see NLRB v. Twin City Carpenters District Council, 422 F.2d 309, 312-313 (8th Cir. 1970).[14]
 
 
 32
 Underlying the "secondary boycott" rule are "the dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own." NLRB v. Denver Building & Construction Trades Council, 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951). Our task here, then, is to determine whether the union picketing was aimed at fostering the interests of the picketed employer's workers, or instead was "tactically calculated to satisfy union objectives elsewhere." Nat'l Woodwork Manufacturers Ass'n v. NLRB, 386 U.S. 612, 644, 87 S.Ct. 1250, 1268, 18 L.Ed.2d 357 (1967).
 
 
 33
 The union's picketing of Monarch in this case did not concern Monarch's employees, but was aimed at enhancing the job opportunities of union members at local manufacturing plants. Monarch was thus a neutral employer presumptively meriting the protection of Section 8(b)(4)(ii)(B), regardless of whether the union had a conventional labor dispute with any other employer. The absence of that primary labor dispute does not by itself in any way prevent the Board from finding that the union's pressure on Monarch violated Section 8(b)(4)(ii)(B).
 
 III. SECTION 8(b)(4)(ii)(B) AND Tree Fruits
 
 34
 We must now proceed to measure the union's conduct against the proscriptive language of Section 8(b)(4)(ii)(B). The parties have essentially framed the issue as whether the union's picketing here merits the protection of the Tree Fruits "exception" to the ban on secondary boycotts.[15] Tree Fruits, however, did not create an "exception" to the proscription of Section 8(b)(4) (ii)(B). Rather, it construed that section and identified a type of consumer boycott which Congress had never intended to prohibit.[16] Our task, therefore, is to apply the statute, guided by the Tree Fruits construction.
 
 The relevant statutory language reads:
 
 35
 It shall be an unfair labor practice for a labor organization or its agents
 
 
 36
 (4) * * * (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce where * * * an object thereof is
 
 
 37
 (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, * * * Provided That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.
 
 
 38
 We are hardly original in recognizing that the meaning of this statutory language is neither obvious nor intuitive. The union, moreover, has introduced perhaps unnecessary difficulty into the issue by inferring from Section 8(b)(4) (ii)(B) rather complex notions of proscribed "intent" and "effect." We believe the issue can be clarified by recognizing that Section 8(b)(4)(ii)(B) essentially creates two separate requirements for a Board finding of an unfair labor practice on the part of a union: (1) The challenged union conduct must have as an object forcing or requiring a neutral business to cease doing business with another business; and (2) the union must pursue its object by threatening, coercing, or restraining the neutral business.[17]
 
 A. Forbidden Object
 The Board found that
 
 39
 an object of the picketing was to force or require Monarch to cease selling non-local soft drinks, and a cessation of business dealings between Monarch and non-local suppliers * * *.
 
 
 40
 JA 433. We believe the Board's finding was based on a proper reading of the statute and substantial evidence. The union argues that its ultimate goal was to preserve job opportunities for its members, and not harm to Monarch's business with the nonlocal manufacturers. We readily accept this statement of the union's ultimate goal, but find it irrelevant to the "object" issue. The statute requires only that "an object" of the picketing be the one proscribed by the statute, NLRB v. Denver Building & Construction Trades Council, supra, 341 U.S. at 688-689, 71 S.Ct. at 951, and the legality of a union's ultimate goal cannot immunize any otherwise illegal intermediate objective, Amalgamated Meat Cutters & Butcher Workmen v. NLRB, 237 F.2d 20, 25 (D.C.Cir.1956), cert. denied, 352 U.S. 1015, 77 S.Ct. 562, 1 L.Ed.2d 545 (1957).
 
 
 41
 The union has also argued both below and here that its object was not the negative one of forcing Monarch to cease trade with the nonlocal manufacturers, but was rather the affirmative one of urging consumers to buy local soft drinks and thus to enhance Monarch's business with the local manufacturers. The Board found this argument disingenuous, JA 430-431, and we think it had good reason to do so. First, the Board had ample evidence in the chanting and remarks the pickets directed at customers that the union wanted Monarch's customers to cease buying nonlocal soft drinks.[18] And even without this direct evidence of intent the Board would have been entitled to use simple logic to infer an object of the union's conduct from the practical realities of the situation. NLRB v. Denver Building & Construction Trades Council, supra, 341 U.S. at 688, 71 S.Ct. at 951. The union could not have been so naive as to think that sympathetic consumers would have increased their normal total consumption of soft drinks to aid the "buy local" campaign, rather than replace intended purchases of nonlocal soda with purchases of local soda. Thus, regardless of the affirmative language on the picket signs and handbills, an object of the picketing must have been to cause consumers to stop buying nonlocal soda. And the Board could also logically conclude that the union intended the natural consequence of a reduction of Monarch's customers' consumption of nonlocal soda a reduction in Monarch's trade with the nonlocal suppliers. JA 431.
 
 
 42
 Elsewhere in its brief, however, the union appears to concede that one object of the picketing was to reduce Monarch's sales of nonlocal soda, but then to argue that this object is not proscribed by the statute because it is identical with the object underlying the consumer boycott which the Supreme Court held legal in Tree Fruits. Union brief at 29, 30, 37. This argument, however, misconceives the Supreme Court's construction of Section 8(b)(4)(ii)(B) in Tree Fruits by confusing the two key requirements for a Board finding of a violation of Section 8(b)(4)(ii)(B): the "object" requirement and the "threaten(ing), coerc(ing), or restrain(ing)" requirement.[19]
 
 
 43
 We readily assume that the union's picketing in this case had the same immediate object as the consumer boycott in Tree Fruits, but this assumption in no way helps the union here. In Tree Fruits the picketers urged customers of the secondary employer, Safeway, not to purchase apples which Safeway had bought from the primary employers, Washington State apple growers, with whom the union had a labor dispute. Tree Fruits, supra, 377 U.S. at 59-61, 84 S.Ct. at 1064-1065. The boycott in that case would appear to have had as an object forcing or requiring Safeway to cease buying apples from the primary employer, and the Supreme Court never said anything to the contrary. The Court held the picketing in front of Safeway legal, not because it lacked the unlawful object described by Section 8(b)(4)(ii)(B), but because it did not exhibit the other key element proscribed by the statute: it did not seek to achieve its object by "threaten(ing), coerc(ing), or restrain(ing)" Safeway in the sense intended by Congress. The Tree Fruits Court directed all its statutory analysis to this second element of Section 8(b)(4)(ii)(B), construing "threaten, coerce, or restrain" as essentially a term of congressional art designed to describe certain types of union behavior that posed special harm to commerce and labor peace; the Court simply held that picketing that only urged customers to boycott a "struck product" without urging a general boycott of the secondary employer's business was not that sort of behavior. Id. at 63, 84 S.Ct. at 1066. The union's picketing of Monarch would therefore be legal only if it did not "threaten, coerce, or restrain" Monarch in the sense conceived by Congress. We must therefore proceed to this last requirement of Section 8(b) (4)(ii)(B).
 
 
 44
 B. "Threaten, Coerce, or Restrain"
 
 
 45
 We have shown that the union exhibited the only intent necessary to support a Board finding of a violation of Section 8(b)(4)(ii)(B): an object of reducing Monarch's trade with nonlocal manufacturers by diminishing its sales of nonlocal soft drinks. The remaining question whether the union pursued its object by "threaten(ing), coerc(ing), or restrain(ing)" Monarch goes not to the motive underlying the boycott, but to the nature and foreseeable consequences of the pressure which the union actually placed on Monarch.
 
 
 46
 In Tree Fruits the Court firmly rejected the view that Congress had determined that all picketing of neutral employers would "threaten, coerce, or restrain" the neutral. See 377 U.S. at 62, 84 S.Ct. at 1065. The Court stressed that Congress had intended to prohibit peaceful picketing only where such a prohibition was necessary to prevent certain "isolated evils." Id. at 63, 84 S.Ct. at 1066. Especially because an overly broad ban on peaceful picketing might violate the First Amendment, the Court declined to infer a congressional intent to ban a particular form of picketing absent unmistakable support for such a ban in the legislative history. Id. at 63, 84 S.Ct. at 1066.
 
 
 47
 The Court concluded that the legislative history of Section 8(b)(4)(ii)(B) did not reveal with the requisite clarity a congressional intent to ban peaceful picketing at secondary sites which is limited to attempting to persuade customers of the secondary not to purchase products supplied by an employer with whom the union has a legitimate direct dispute. Id. Such picketing is not "attended by the abuses at which the statute was directed," id. at 64, 84 S.Ct. at 1067, and thus does not "threaten, coerce, or restrain" within the meaning intended by Congress. And we acknowledge, along with the Board, that a peaceful consumer boycott that merely persuades customers of a neutral to participate in a union's "buy union" or "buy local" campaign closely resembles the type of boycott held legal in Tree Fruits and thus can escape the proscription of Section 8(b)(4)(ii)(B). NLRB v. Upholsterers Frame & Bedding Wkrs. Twin City Local No. 61, 331 F.2d 561 (8th Cir. 1964) (peaceful picketing to persuade customers to buy only local, union-made products of manufacturers named in leaflets legal under Tree Fruits ); see 2 Legislative History of the Labor-Management Reporting and Disclosure Act of 1959 at 1432 (1959) (statement of Senator John Kennedy) (statute not intended to bar "buy American" campaigns by unions to protect working standards).
 
 
 48
 Nevertheless, the Board and the courts have inferred from Tree Fruits the principle that otherwise legal consumer boycotts of struck or disfavored products do "threaten, coerce, or restrain" neutral employers if they fail to distinguish favored from disfavored products with sufficient clarity. NLRB v. San Francisco Typographical Union 21, 465 F.2d 53 (9th Cir. 1972); Bedding, Curtain & Drapery Wkrs. Union, Local 140 v. NLRB, 390 F.2d 495 (2d Cir.), cert. denied, 392 U.S. 905, 88 S.Ct. 2056, 20 L.Ed.2d 1363 (1968); Local 248, Meat & Allied Food Wkrs., 230 NLRB 189, 202-204 (1977); Independent Routemen's Ass'n & Urban Distributors, Inc., 206 NLRB 245, 248 (1973); Atlanta Typographical Union No. 48 (Times-Journal, Inc.), supra, 180 NLRB 1014; Laundry, Dry Cleaning & Dye House Wkrs. Local 259, 164 NLRB 426, 428 (1967); Local 150, Chauffeurs, Teamsters & Helpers, 151 NLRB 734, 739 (1965).[20] Though it nowhere explicitly states its claim as such, the union here seems to be challenging the statutory basis for this whole line of cases, and for the Board's adherence to them in its decision that the picketing here did "threaten, coerce, or restrain" Monarch. However, we believe this doctrine does have a basis in the statute, especially as the statute was construed in Tree Fruits.
 
 
 49
 The key to Tree Fruits lay in the Court's careful definition of the type of boycott which Congress intended to leave unrestricted and which therefore does not "threaten, coerce, or restrain" neutrals:
 
 
 50
 When consumer picketing is employed only to persuade customers not to buy the struck product, the union's appeal is closely confined to the primary dispute. The site of the appeal is expanded to include the premises of the secondary employer, but if the appeal succeeds, the secondary employer's purchases from the struck firms are decreased only because the public has diminished its purchases of the struck product. * * *
 
 
 51
 Tree Fruits, supra, 377 U.S. at 72, 84 S.Ct. at 1071 (emphasis added). A picket does not "threaten, coerce, or restrain" the neutral in the sense conceived by Section 8(b)(4)(ii)(B) if it is so "closely confined" to protecting the union's interest in the primary controversy that it poses no more harm to the neutral's business than the neutral would face from the primary controversy itself. In the case of a consumer boycott, a picket does not "threaten, coerce, or restrain" the neutral if it confines itself to the product the continuing sale of which directly undermines the union's interest. A boycott that goes beyond the scope of the legitimate primary dispute effectively creates a "separate dispute" with the neutral. Id. And since this extra pressure the union places on the neutral causes more interference with the latter's business than it would suffer as a natural consequence of the union's success in its primary controversy, it falls within the congressional ban. See Lesnick, The Gravamen of the Secondary Boycott, 62 Colum.L.Rev. 1363, 1412-1413 (1962).[21]
 
 
 52
 Thus a union's appeal to consumers to boycott specific products sold by a neutral employer must be no more than an expression of its legitimate campaign to advance its interests against its direct antagonist. It must "closely confine" any appeal on the site of the neutral business[22] to the scope of that original campaign by giving consumers sufficient information to recognize the disfavored product. If the appeal is not so confined it may cause consumers to boycott products to which the union is indifferent or even those which the union favors,[23] and thus may subject the neutral to economic pressure and harm which exceed the scope of the union's legitimate campaign.
 
 
 53
 In a Second Circuit case the union, intending that customers of a neutral retailer boycott bedding manufactured by a firm which did not have a contract with the union, urged the customers to look for its union label on all prospective purchases at the retail store. Bedding, Curtain & Drapery Wkrs Union, Local 140 v. NLRB, supra, 390 F.2d at 496-497. The court found the union appeal overbroad because even some of the union-made products sold by the retailer did not carry the union label and because the appeal encompassed two types of products furniture and upholstery which the primary employer did not even make. Id. at 502. The court concluded that the boycott on the premises of the neutral "failed to isolate the dispute and was thus closer to an appeal 'to shut off all trade with the secondary employer' than to picketing 'which only persuades his customers not to buy the struck product.' "[24] Id. at 502-503, quoting Tree Fruits, supra, 377 U.S. at 70-72, 84 S.Ct. at 1070-1071. A union's good faith its intent to limit the boycott to the struck product is legally irrelevant to the question whether its appeal will "threaten, coerce, or restrain" the neutral. Rather, the dispositive question is the reasonably foreseeable effect of the union's message on consumers. NLRB v. Retail Store Employees Union, Local 1001, 447 U.S. 607, 613, 100 S.Ct. 2372, 2376, 65 L.Ed.2d 377 (1980); Hoffman ex rel. NLRB v. Cement Masons Local 337, 468 F.2d 1187 (9th Cir. 1972), cert. denied, 411 U.S. 986, 93 S.Ct. 2269, 36 L.Ed.2d 964 (1973).
 
 
 54
 The Board acted logically in this case in treating, for purposes of analysis under the statute, the nonlocal manufacturers as "primary employers" with whom the union was engaged in a controversy. But emphasis on this legal analogy is unnecessary in applying Section 8(b)(4)(ii)(B) to the facts of this case. The simple point is that the union had a legitimate interest in conducting a "buy local" campaign to preserve its members' jobs, and the law would require Monarch to endure whatever pressure resulted solely from the union's success in urging consumers to boycott the nonlocal soda. However, by failing to tailor its campaign precisely the union exposed Monarch to more economic pressure than the union's interest in a buy local campaign warranted. It thus violated Section 8(b)(4)(ii)(B).
 
 
 55
 The union, however, has vigorously mounted another sort of attack on the Board's action here, charging that even if a union boycott can lose its statutory protection by making an overbroad appeal to consumers, the appeal here was not sufficiently overbroad to violate Section 8(b)(4)(ii)(B). The union is really making two separate, though related, arguments here.
 
 
 56
 First, it argues that under Tree Fruits a product boycott is only illegal if it amounts to a complete boycott of the secondary's business, and that the buy local campaign here was thus legal because it could at most deprive Monarch of the 35 percent of its retail income stemming from soda sales.[25] It is true that in holding legal the boycott of Washington State apples at Safeway the Tree Fruits Court at several points distinguished that boycott from "a union appeal to the public at the secondary site not to trade at all with the secondary employer," 377 U.S. at 63, 84 S.Ct. at 1066, or picketing "to shut off all trade with the secondary employer," id. at 70, 84 S.Ct. at 1070, or "not to trade at all" with the secondary, id. at 72, 84 S.Ct. at 1071. But the Court referred to the total boycott only as a counter-example for its analysis, not as the sole example of an illegal consumer boycott. As the union itself has stressed here in a different context, although the Tree Fruits case offers general guidance on the meaning of the statute, it did not decide, because it had no occasion to decide, the legality of all types of union boycotts. The Tree Fruits Court did not address the issue of a boycott that posed harm to a substantial part, but not all, of a secondary employer's business. And, more specifically, because the union in Tree Fruits was painstaking in its identification of the struck product, id. at 60-61, 84 S.Ct. at 1064-1065, the Court had no occasion to decide the legality of an overbroad boycott message that put excessive pressure on the secondary but did not put his entire business in jeopardy.
 
 
 57
 In its recent decision in NLRB v. Retail Store Employees Union, Local 1001, supra, handed down after argument in the present case, the Supreme Court answered one of the important questions left open by Tree Fruits : the legality of a union-urged boycott strictly limited to a product supplied by an employer with whom the union has a primary labor dispute where that product amounts to all or virtually all of the secondary employer's business. In holding such a boycott illegal where the struck product comprised over 90 percent of the secondary's business, the Court reasoned that the union campaign inevitably and foreseeably posed the same harm to the secondary as the type of boycott which Tree Fruits said would be illegal: It required the sympathetic consumer to refuse all business with the secondary. 447 U.S. at 613, 100 S.Ct. at 2376.[26] The Court therefore held that a boycott that otherwise met the test of Tree Fruits urging no more than a consumer boycott of the struck product was illegal where the natural consequence of such boycott would be "ruin or substantial loss" to the secondary. Id. However, the Court was not asked to decide whether the type of boycott held illegal there was the only one proscribed by Section 8(b)(4)(ii)(B), and, once again, since there was no claim in Retail Store Employees that the union picket misidentified the struck product, the Court did not address the issue of the sort of overbroad union appeal we face in this case. Retail Store Employees seems simply to supplement the Tree Fruits definition of "threaten, coerce, or restrain": a union's consumer-aimed boycott of a neutral employer will "threaten, coerce, or restrain" that employer if it either fails to limit itself to an appeal to boycott the struck or disfavored product or creates the danger of "ruin or substantial loss" to the employer.
 
 
 58
 The second part of this final union claim is that the picket not only did not call for a complete boycott of Monarch, but it failed even to deal any demonstrable financial harm to Monarch. The union argues that the statutory phrase "threaten, coerce, or restrain" creates an empirical requirement for the Board, and that the picketing was legal absent empirical proof that Monarch actually suffered a significant loss of income because its customers were confused or deterred by the union's appeal.
 
 
 59
 Contrary to the union's argument, however, nothing in the statute required the Board to produce actual empirical evidence. Section 8(b)(4), rather, is concerned with the nature of the pressure the union imposes on the secondary and the reasonably foreseeable effects of that pressure. NLRB v. Retail Store Employees Union, Local 1001, supra, 447 U.S. at 613, 100 S.Ct. at 2376.[27] Nor does the recent Retail Store Employees decision, which does introduce the question of economic effect into some secondary boycott cases, offer any support for the union here. As we noted earlier, Retail Store Employees permits the Board to order cessation of boycotts that threaten "ruin or substantial loss" to a secondary, but nowhere states that an extremely costly secondary boycott is the only type proscribed by Section 8(b)(4)(ii)(B).[28] Moreover, even where Retail Store Employees does permit the Board to invoke economic effect as a legal factor, it would allow the Board to rely on a prediction of likely effect, rather than empirical proof of actual effect. Id.
 
 
 60
 Of course, the Board might be exceeding its powers under the statute if it acted against a consumer boycott that could have only a trivial economic effect on the secondary. See NLRB v. Local 825, Int'l Union of Operating Engineers, 400 U.S. 297, 305, 91 S.Ct. 402, 407, 27 L.Ed.2d 398 (1971). But such is hardly the case here, where the Board amassed ample and convincing evidence of significant overbreadth in the union appeal, overbreadth that would foreseeably cause very significant harm to Monarch. The Board emphasized the union's total failure to inform customers about the meaning it attributed to the term "local." JA 437-438. Its handbills were only marginally more specific than its picket signs, alluding vaguely to the New York Metropolitan Region. They did not identify the 11 counties the union sought to benefit, nor did they list manufacturers or brands that customers should or should not buy.[29] Some of the picketers' chanting, encouraging customers to buy elsewhere, could have created the impression that none of Monarch's soda was sufficiently "local." The Board could reasonably conclude, therefore, that customers would have trouble determining the local or nonlocal character of even those brands of soda whose place of manufacture was discernible from the bottle or can. This problem would be exacerbated by the difficulty of locating and interpreting identification marks on the containers, as detailed in the Board's findings.[30]
 
 
 61
 We thus conclude that the Board had substantial evidence to support its conclusion that the union campaign would have the reasonably foreseeable effect of causing customers to boycott local soda because they erroneously took it to be nonlocal,[31] or to become discouraged over their inability to distinguish the favored from the disfavored soda and thus decline to buy any soda, or to infer from the unclear signs, in combination with some of the chanting and booing of the picketers, that the union actually intended a complete boycott of soda at Monarch.[32] In such a circumstance, we must defer to the Board's careful assessment of the facts.[33]
 
 IV. THE CONSTITUTIONAL QUESTION
 
 62
 The union undergirds its statutory arguments with the claim that the Board's application of Section 8(b)(4)(ii)(B) here so severely restricts the union's power to appeal to the public that it violates the First Amendment. However, the Supreme Court has made clear that a narrow construction of the statutory ban on secondary boycotts, relying only on the very clearest manifestations of congressional intent to ban a particular type of boycott, avoids collision with the Constitution. Tree Fruits, supra, 377 U.S. at 65, 84 S.Ct. at 1067. Here, the Board carefully adhered to the cautious construction of the statute required by Tree Fruits. It recognized that construing the statute to ban a "buy local" campaign that restricted its public appeal to a boycott of legitimately disfavored products would raise First Amendment problems. It carefully marshalled evidence demonstrating that the union picketing in this case placed a peculiarly severe burden on commerce by imposing on a neutral employer economic pressure disproportionate to the union's legitimate campaign to protect its members' jobs.
 
 
 63
 In NLRB v. Retail Store Employees Union, Local 1001, supra, Justice Powell reaffirmed the Tree Fruits principle that a careful reading of the statute, geared only to prevent the special evils with which Congress was concerned, posed no threat to the First Amendment. 447 U.S. at 613, 100 S.Ct. at 2376. Justice Blackmun wrote a concurring opinion, expressing the view that a ban on a union's public expression is consistent with the First Amendment if it advances the substantial governmental interest in protecting neutral businesses from industrial strife not of their own making. 447 U.S. at 616, 100 S.Ct. at 2378. In a separate but similar concurrence Justice Stevens noted that labor picketing is more subject to government regulation than other forms of expression because of its unique power to create economic pressure. Id.; see Bakery & Pastry Drivers & Helpers Local 802 v. Wohl, 315 U.S. 769, 776-777, 62 S.Ct. 816, 819-820, 86 L.Ed. 1178 (1942) (Douglas, J., concurring). Justice Stevens stressed, however, that such regulation must be carefully tailored to the governmental interest in preventing such coercion. The Board's action here satisfied the concerns of both concurring Justices. The Board was painstaking in examining the nature and determining the potential harm of the union activity at issue, and has kept its restriction sufficiently narrow to leave the union ample means to advance its interests.
 
 
 64
 The Board's cross-application for enforcement is granted and its decision is affirmed.
 
 
 65
 So ordered.
 
 WALD, Circuit Judge, dissenting:
 
 66
 I dissent because I do not believe the kind of consumer picketing involved here is proscribed by § 8(b)(4). To hold, as the majority does, that virtually every kind of peaceful consumer picketing by a labor union presumptively falls within that section's prohibitions[1] not only runs counter to the judicial and legislative policy against erecting broad prohibitions likely to conflict with first amendment guarantees but also finds no support in the legislative history of the National Labor Relations Act (NLRA or Act), 29 U.S.C. § 151 et seq. I believe that the union's activity in this case failed to create the "isolated evil" legislated against by § 8(b)(4), and thus was beyond the regulatory power of the NLRB.
 
 
 67
 A. A statute regulating first amendment protected picketing must be construed narrowly.
 
 
 68
 The first amendment requires that legislation regulating protected speech, as the picketing at issue in this case is, be interpreted narrowly. The Supreme Court specifically recognized the necessity for an appropriately narrow construction of § 8(b)(4) to avoid constitutional problems in NLRB v. Fruit & Vegetable Packers Local 760 (Tree Fruits), 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964). It mandated extreme caution in reading § 8(b)(4) to cover any kind of consumer picketing that had not been clearly targeted by Congress, and reversed a holding by the Board that § 8(b)(4) meant all "consumer picketing in front of a secondary establishment is prohibited," 377 U.S. at 62, 84 S.Ct. at 1065.
 
 
 69
 Throughout the history of federal regulation of labor relations, Congress has consistently refused to prohibit peaceful picketing except where it is used as a means to achieve specific ends which experience has shown are undesirable. "In the sensitive area of peaceful picketing Congress has dealt explicitly with isolated evils which experience has established flow from such picketing." Labor Board v. Drivers Local Union, 362 U.S. 274, 284, (80 S.Ct. 706, 712, 4 L.Ed.2d 710). We have recognized this congressional practice and have not ascribed to Congress a purpose to outlaw peaceful picketing unless "there is the clearest indication in the legislative history," ibid., that Congress intended to do so as regards the particular ends of the picketing under review. Both the congressional policy and our adherence to this principle of interpretation reflect concern that a broad ban against peaceful picketing might collide with the guarantees of the First Amendment.
 
 
 70
 Id. at 63-4, 84 S.Ct. at 1066-1067 (emphasis supplied).
 
 
 71
 The Court itself defined, in the labor context, the "specific ends which experience has shown are undesirable" as follows:
 
 
 72
 All that the legislative history (of § 8(b)(4)) shows in the way of an "isolated evil" believed to require proscription of peaceful consumer picketing at secondary sites was its use to persuade the customers of the secondary employer to cease trading with him in order to force him to cease dealing with, or to put pressure upon, the primary employer.
 
 
 73
 377 U.S. at 64, 84 S.Ct. at 1067. I thus believe the Court's decision in Tree Fruits limited § 8(b)(4)'s coverage to those situations in which consumer picketing gives rise to this Congressionally-defined "isolated evil."[2]
 
 
 74
 B. The picketing involved in this case did not give rise to such an "isolated evil."
 
 
 75
 The facts in this case in no way fit the definition of the "isolated evil" the Court identified as the focus of Congressional concern in § 8(b)(4). As found by the Board, the union's ultimate goal was "to save jobs for its members," J.A. 432 n.17, by appealing to customers of Monarch to buy only local soda. It did not desire to affect the labor practices of non-local bottlers in any way; it did not even know who they were. The worst cast that the Board put upon the union's actions is that it sought to have the retailer stop buying non-local soda, J.A. 431-3, and even this interpretation I cannot accept on the evidence in this case.[3]
 
 
 76
 1. The "isolated evil" was not present because no labor dispute was involved.
 
 
 77
 The Board specifically found that the union was not engaged in any "labor dispute" with the non-local bottlers within the meaning of the Act. J.A. 431, 444. The Board and the court here, however, decided that a § 2(9) labor dispute is not always necessary for a § 8(b)(4) violation. While there is some support for that position,[4] there is equal support for the proposition that courts must proceed with great care in authorizing consumer picketing bans outside of the context of a labor dispute, for there is grave danger in too lightly discarding this built-in restriction of the Board's power over a union's decision to communicate with the public on a matter of general concern.
 
 
 78
 Although § 8(b)(4)'s applicability is not explicitly limited to "labor disputes," the NLRA as a whole focuses on the provision of orderly procedures for the resolution of labor disputes to avoid industrial strife. Unfair labor practices, in the statutory scheme, are typically actions taken in the course of a labor dispute, and attempts to apply the statutory language when there is no labor dispute pose a distinct danger of wrenching both the purposes and the language of the act out of context. See, e. g., 29 U.S.C. §§ 141, 151 (declarations of policy). This view of the Act has been accepted by the Supreme Court, see Marine Cooks & Stewards v. Panama S.S. Co., 362 U.S. 365, 80 S.Ct. 779, 4 L.Ed.2d 797 (1960) ("Congress ... passed the Taft-Hartley Act to regulate the conduct of people engaged in labor disputes"), and reinforced by later, related Congressional legislation.[5] The existence of a labor dispute serves as an automatic guidepost limiting the scope of regulation of speech to those situations which were clearly identified by Congress as the "isolated evil" which need be prevented.
 
 
 79
 When courts have applied § 8(b)(4) outside the technical boundaries of a labor dispute they have stressed the functional similarities between the facts before them and the traditional labor disputes Congress was considering when it enacted § 8(b)(4). Our own court has said the extension must be within the "spirit," as well as the "letter of the statute."[6] Close examination of each fact situation is necessary to insure that the requisite "isolated evil" and Congressional intent to regulate exists in the absence of a labor dispute. See Lesnick, supra, at 1017-18.
 
 
 80
 No such analysis was done here by the Board or the court.[7] This decision by the Board and court appears to bring all "Buy Local," "Buy America," perhaps even "Buy Good Quality" or "Don't Buy Dangerous Additive" union picketing under Board regulation and proscription if its content does not conform to Board rules. I do not believe Congress[8] or the Supreme Court's recent decisions on § 8(b)(4) meant that to happen,[9] certainly not without more specific reference to and more secure moorings in the history and spirit of § 8(b)(4).[10]
 
 
 81
 2. The "isolated evil" did not exist because the picketing was not aimed at a cessation of all patronage of the neutral employer.
 
 
 82
 In Tree Fruits, the Supreme Court held that consumer picketing aimed at persuading Safeway Stores' retail customers not to buy a "struck product," Washington State apples, with whose packers the union had an ongoing labor dispute did not violate § 8(b)(4). After surveying the legislative history of that section the Court found:
 
 
 83
 There is thus nothing in the legislative history prior to the convening of the Conference Committee which shows any congressional concern with consumer picketing beyond that with the "isolated evil" of its use to cut off the business of a secondary employer as a means of forcing him to stop doing business with the primary employer.
 
 
 84
 377 U.S. at 68, 84 S.Ct. at 1069 (emphasis supplied). It then went on to analyze the product picketing in the case before it.
 
 
 85
 We come then to the question whether the picketing in this case, confined as it was to persuading customers to cease buying the product of the primary employer, falls within the area of secondary consumer picketing which Congress did clearly indicate its intention to prohibit under § 8(b)(4)(ii). We hold that it did not fall within that area, and therefore did not "threaten, coerce, or restrain" Safeway. While any diminution in Safeway's purchases of apples due to a drop in consumer demand might be said to be a result which causes respondents' picketing to fall literally within the statutory prohibition, "it is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers." Holy Trinity Church v. United States, 143 U.S. 457, 459 (, 12 S.Ct. 511, 512, 36 L.Ed. 226). See United States v. American Trucking Assns., 310 U.S. 534, 543-544 (, 60 S.Ct. 1059, 1063-1064, 84 L.Ed. 1345). When consumer picketing is employed only to persuade customers not to buy the struck product, the union's appeal is closely confined to the primary dispute. The site of the appeal is expanded to include the premises of the secondary employer, but if the appeal succeeds, the secondary employer's purchases from the struck firms are decreased only because the public has diminished its purchases of the struck product. On the other hand, when consumer picketing is employed to persuade customers not to trade at all with the secondary employer, the latter stops buying the struck product, not because of a falling demand, but in response to pressure designed to inflict injury on his business generally. In such case, the union does more than merely follow the struck product; it creates a separate dispute with the secondary employer.
 
 
 86
 Id. at 71-2, 84 S.Ct. at 1070-1071 (emphasis supplied).
 
 
 87
 As a preliminary matter, two things about Tree Fruits and its relationship to this case are worth noting. First, Tree Fruits involved consumer picketing of retail stores in which apples were being sold that had been packed by employers with whom the picketing union had an ongoing strike. The existence of a labor dispute with a primary employer was uncontested. Here we have none.
 
 
 88
 Secondly, the real message of Tree Fruits one I do not think the Board or the majority opinion fully appreciates is that only those kinds of picketing identified by Congress as constituting the "isolated evil" it was addressing in § 8(b)(4) are outlawed. Consumer picketing of retailers to get them not to buy "struck products" is only one example of what § 8(b)(4) does not cover. The opinion assumes there may well be many other kinds of consumer picketing, like the kind involved here, which § 8(b)(4) also does not cover because they were not part of the "isolated evil" Congress attacked. The Board and this court unfortunately treat Tree Fruits as though its facts defined the only kind of consumer picketing not covered by § 8(b)(4), and unless all other kinds of picketing can be brought under its umbrella, they must fall. This, to me, is standing the case on its head.
 
 
 89
 But even within the confines of the Tree Fruits doctrine, it is apparent on this record that the picketing here does not qualify for § 8(b)(4) treatment and that the Board's and court's expansion of that doctrine to include it creates an entirely new class of proscribed picketing without, I fear, any roots in legislative intent or Supreme Court decisions.
 
 
 90
 Tree Fruits makes it clear that consumer picketing alone is not coercive; there must be picketing "plus." Tree Fruits makes explicit what the "plus" is. There must be conduct which supports a reasonable inference that the "isolated evil" which Congress sought to avoid might occur and the "isolated evil" is that the public will interpret the union's plea as a request not to patronize the neutral employer at all :
 
 
 91
 This narrow focus reflects the difference between such conduct and peaceful picketing at the secondary site directed only at the struck product. In the latter case, the union's appeal to the public is confined to its dispute with the primary employer, since the public is not asked to withhold its patronage from the secondary employer, but only to boycott the primary employer's goods. On the other hand, a union appeal to the public at the secondary site not to trade at all with the secondary employer goes beyond the goods of the primary employer, and seeks the public's assistance in forcing the secondary employer to cooperate with the union in its primary dispute.
 
 
 92
 377 U.S. at 63-4, 84 S.Ct. at 1066-1067 (emphasis supplied). An employer threatened with "ruin or substantial loss," NLRB v. Retail Store Employees Union Local 1001, 447 U.S. 607, 615 n.11, 100 S.Ct. 2372, 2377 n.11, 65 L.Ed.2d 377 (1980), is likely to be economically coerced into joining a battle not its own on the side of the union, to pressure the primary employer to save itself. Tree Fruits, 377 U.S. at 63, 84 S.Ct. at 1066; Honolulu Typographical Union Local 37 v. NLRB, 401 F.2d 952, 955 (D.C.Cir.1968).
 
 
 93
 An appeal carefully limited to a boycott of a struck product may fall within the ban of § 8(b)(4)(ii)(B), but only if that product constitutes nearly all the neutral's business. Only in that situation can one conclude that a single product boycott is "reasonably calculated to induce customers not to patronize the neutral at all." See NLRB v. Retail Store Employees Union Local 1001, 447 U.S. 607, 615, 100 S.Ct. 2372, 2377, 65 L.Ed.2d 377 (1980); Honolulu Typographical Union Local 37 v. NLRB, 401 F.2d 952, 955 (D.C.Cir.1968) (merged product case; appeal to boycott struck product urged consumers "to boycott and entirely cease their patronage of the secondary employer").[11] The question in every case, according to the Supreme Court, is whether "the secondary appeal is reasonably likely to threaten the neutral party with ruin or substantial loss." At 615 n.11, 100 S.Ct. at 2377 n.11. Such a high level of potential harm fits comfortably with the words "threaten, coerce or restrain."
 
 
 94
 In this case, the Board specifically found that the object of Respondent's picketing was not to stop all trading with Monarch, but only to stop the sales of and dealings with out of state soda pop bottlers[12] which accounted for only a small percent of Monarch's retail trade. Nor did the Board make any findings to suggest that the picketing had the potential or reality to effect "ruin or substantial loss."[13]
 
 
 95
 The Board and the panel, however, bypass these pivotal findings altogether and rule that it is enough that the customers may be "confused" by the lack of information on the picket signs as to specifically which soda is bottled locally and either refrain from buying soda altogether or from buying soda which may be local as well as non-local. In so doing, they read both the "intent to cut off business" requisite of Tree Fruits and the "substantial economic harm" test of Retail Employees out of § 8(b)(4) altogether. This I believe is unparalleled as well as unwarranted.
 
 
 96
 The means by which the Board and this court create a new "Tree Fruits plus" test for lawful picketing, is through the Board's own "vague sign doctrine." If the product being picketed or in this case the product being "pushed" is not, in the Board's judgment, clearly enough identified on the picket signs, the picketing falls under § 8(b)(4) regardless of whether it was intended or had even the remotest chance of effecting any cut off of or substantial loss in the retailer's business.
 
 
 97
 The Board, subsequent to Tree Fruits, laid down a principle that consumer picketing at the site of a secondary employer must clearly identify the struck product. United Paperworkers Local 382 (Duro Paper Bag Mfg. Co.), 236 NLRB No. 183, 98 LRRM 1430 (1978). Its "vague sign" doctrine presumably exists because it is reasonable to conclude in some circumstances, if the sign is vague enough, that consumers will interpret the request as a broad request to boycott the neutral altogether. For instance, if a picket sign says "XYZ Corp. Unfair: This Store Carries XYZ Products," it would be within the Board's power to decide that this appeal in fact requested consumers not to go into the store. See, e. g., Local 248, Meat & Allied Food Workers (Milwaukee Independent Meat Packers Association), 230 NLRB 27, 96 LRRM 1221 (1977) (pickets in front of McDonald's Restaurant carrying signs "To the Public Help Support Local 248"). But whether or not such confusion is in fact generated and a "do not patronize" message sent to consumers is a factual issue in each case and there are no findings or evidence that that was the case here. See J.A. A-439 (decision of administrative law judge). Certainly such a message is less likely if a sign is not a boycott request at all, but is rather an affirmative "Please Buy." It takes quite a leap of imagination and violates a few advertising maxims to conclude that a request to consumers that they please go in and buy a particular product is in fact and in likely effect a request that he or she refuse to go in and buy anything at all. I am not at all sanguine that the Board has authority after Tree Fruits to find violative of § 8(b)(4) all consumer picketing which does not meet the stringent standards of identification it insists on here.[14] Whether or not the local soda was clearly identified by name and bottler, I do not think this kind of picketing of a product which comprised a minor part of the store business can be found violative of § 8(b)(4) in the absence of any finding that it posed a realistic threat of "ruin or substantial loss"[15] to the retailer and in the presence of a specific finding that its object was not to provoke customers to cease doing business with Monarch.[16]
 
 CONCLUSION
 
 98
 Unless all customer-targeted picketing of retailers by unions is to potentially fall under the sword of § 8(b)(4), without regard to intent or effect,[17] it is impossible to fathom the result in this case. There is no "primary" employee with whom the union has a "labor dispute," hence no "secondary boycott," not even a "struck product," no negative appeal asking customers to boycott the retailer altogether, nor even to boycott anything he sold, no evidence of total or even "substantial" economic harm resulting to the retailer, simply union members appealing to customers to buy the products their members worked on. The opinion, dangerously I think, systematically discards each of the limitations which might be relied upon to avoid first amendment difficulties with § 8(b)(4)(ii)(B).[18] Where then are we to locate the necessary "substantial state interest," "finely tailored" regulation and "clearest indication in the legislative history" the Court has mandated before peaceful picketing can be barred? Carey v. Brown, 447 U.S. 455, 100 S.Ct. 2286, 2290, 65 L.Ed.2d 263, 4756, 4757 (June 20, 1980); Tree Fruits, 377 U.S. 58, 63, 84 S.Ct. 1063, 1066, 12 L.Ed.2d 129 (1964). I cannot find in the opinion or record in this case any compelling policy reasons to justify an attempt to cram these unruly ingredients into a § 8(b)(4) secondary boycott or Tree Fruits mold. They present an altogether different situation of peaceful union picketing to induce customers to lend their buying power to the cause of local workers, a situation not, I believe, identified by Congress as an "isolated evil" or sufficiently analyzed by the Board or this court as to whether it poses the kind of threat to neutral retailers Congress legislated against in § 8(b)(4). Hence I cannot vote to enforce the Board's order.
 
 
 
 [1]
 A "manufacturer" of soft drinks in the context of this case is a firm that bottles or cans and distributes the soft drink, not a firm that produces the bottle or can itself. Decision of Administrative Law Judge (ALJ) at 3 n.2, Joint Appendix (JA) 421 n.2. The ALJ's decision is reproduced at JA 419-442 and the Board's decision and order at JA 443-445. They will be cited hereinafter only to JA
 
 
 [2]
 Local 812 was not, however, the only union representing soft drink workers within this area
 
 
 [3]
 The union's business agent estimated that 1,000 jobs in the local soft drink industry had been lost in the year preceding the picketing in this case, of which 600 had been held by Local 812's members. JA 422
 
 
 [4]
 The union's agent testified without contradiction, however, that the union had never actually identified the nonlocal manufacturers and had no interest in representing their employees. JA 422 n.5
 
 
 [5]
 In attempting to minimize the effect of its picketing on Monarch Corporation, the union continually emphasizes that the wholesale outlet, which the union did not picket, produced 80% of the corporation's business income and the retail store only 20%. We believe, however, that the Board was justified in regarding the union's interference with Monarch's retail trade as sufficient to invoke § 8(b)(4)(ii)(B). Even though the picketing did not aim at forcing Monarch Corporation as a whole to cease all trade with the nonlocal manufacturers, the statute only requires the Board to show that the union intended some significant disruption of the neutral employer's trade with another business. NLRB v. Local 825, Int'l Union of Operating Engineers, 400 U.S. 297, 304-305, 91 S.Ct. 402, 407, 27 L.Ed.2d 398 (1971). Nothing in the statute suggests that union pressure on a neutral employer's premises is immune simply because the neutral employer does a great amount of its business at another site which the union has left alone
 
 
 [6]
 See note 4 supra
 
 
 [7]
 As we note later, however, under the Supreme Court's very recent decision in NLRB v. Retail Store Employees Union, Local 1001, 447 U.S. 607, 100 S.Ct. 2372, 65 L.Ed.2d 377 (1980), even a boycott so confined may violate the statute if it poses a danger of ruinous loss of business to the neutral employer. See text and notes at notes 26-28 infra
 
 
 [8]
 See 2 Legislative History of the Labor-Management Reporting and Disclosure Act of 1959 at 1432 (1959) (statement of Senator John Kennedy)
 
 
 [9]
 In affirming the recommendation of the ALJ the Board very slightly qualified one of his findings. The ALJ had found that soft drink brands such as Cott, Hirsh, and Yoo-Hoo did not always contain the place of manufacture. JA 428. The Board agreed with the union that these products did contain the names of the places of manufacture, but noted that these names were not identified for the consumer as the place of manufacture and that in any event the ALJ had ample other support for his conclusion that the union had failed to help consumers distinguish local from nonlocal soda. JA 423 n.1
 
 
 [10]
 In Delta Steamship Lines the chief authority presented for the view that § 2(9) does create a jurisdictional barrier was a Fourth Circuit case, NLRB v. Int'l Longshoremen's Ass'n, 332 F.2d 992 (4th Cir. 1964). Nat'l Maritime Union v. NLRB (Delta Steamship Lines), 346 F.2d 411, 414-415 (D.C.Cir.), cert. denied, 382 U.S. 840, 86 S.Ct. 90, 15 L.Ed.2d 82 (1965). We noted, however, that although the Fourth Circuit had held that the union activity proscribed by the Board there did not meet the jurisdictional requirement of a labor dispute, it had also hedged the issue by reaching the merits and holding in the alternative that because there was no forced work stoppage there, but only a refusal to supply labor, the union would not in any event have violated the secondary boycott provision. Id. at 415; see NLRB v. Int'l Longshoremen's Ass'n, supra, 332 F.2d at 996-999. Moreover, we noted that Int'l Longshoremen's Ass'n had relied for its authority on the § 2(9) question on a statement made by the Supreme Court in a wholly different context. In Marine Cooks & Stewards v. Panama Steamship Co., 362 U.S. 365, 80 S.Ct. 779, 4 L.Ed.2d 797 (1960), the Court construed § 1 of the Norris-LaGuardia Act, 29 U.S.C. § 101, to determine whether the District Court was barred from issuing an injunction in a labor dispute. Construing the term "labor dispute" broadly, the Court stated, "Congress passed the Norris-LaGuardia Act to curtail and regulate the jurisdiction of the courts, not, as it passed the Taft-Hartley Act, to regulate the conduct of people engaged in labor disputes." Id. at 372, 80 S.Ct. at 784. We noted in Delta Steamship Lines, supra, that this casual statement in the context of a Norris-LaGuardia Act case did not amount to a pronouncement on the Board's power to hear a charge of an unfair labor practice. 364 F.2d at 415
 
 
 [11]
 The union argues that the Board was obligated to prove a "labor dispute" because the General Counsel's complaint had alleged such a dispute. See JA 6. We agree with the Board that this erroneous allegation in the complaint in no way prejudiced the union, which had clear notice of the essential charges against it and a full opportunity to argue its position before the Board. NLRB v. Mackey Radio & Telegraph Co., 304 U.S. 333, 350, 58 S.Ct. 904, 912, 82 L.Ed. 1381 (1938)
 Moreover, even if we were to construe § 2(9) as a jurisdictional requirement, the definition of "labor dispute" in that section might be broad enough to encompass the controversy in this case. Congress explicitly stated that labor disputes are not limited to controversies in which "the disputants stand in the proximate relation of employer and employee," 29 U.S.C. § 152(9) (1976), and the phrase "any controversy concerning terms, tenure or conditions of employment," id., is general enough to include a situation in which a union exerts pressure on businesses to preserve the economic foundation of its members' livelihoods. When the courts have drawn boundaries around the area of "labor disputes," they have done so only to exclude from that category controversies in which a union acts out of a political interest which it may share with all other citizens and which in no way enhances the distinct economic interests of its members. NLRB v. Int'l Longshoremen's Ass'n, supra note 10, 332 F.2d at 996 (stevedores express position on Cuban missile crisis by refusing to load any ship involved in trade with Cuba). Where the union's goal is economic, not political, and especially where the motive behind the union conduct at issue is to secure more employment for its members, the union may well be involved in a labor dispute. Mountain Navigation Co. v. Seafarers' Int'l Union, 348 F.Supp. 1298, 1302-1303 (W.D.Wis.1971) (distinguishing Int'l Longshoremen's Ass'n ); see Sachs v. Local Union No. 48, United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Industry, 454 F.2d 879, 883 (4th Cir. 1972) ("The mark of a labor dispute is the presence of economic adversaries.").
 
 
 [12]
 Although the NMU was engaged in a dispute with another union, our decision went well beyond the mere holding that an inter-union conflict could play the role of a "primary labor dispute" in place of the more typical union-employer conflict. We stressed that the central concern of Congress was protecting a neutral employer from labor strife in which it is not a directly interested party. Delta Steamship Lines, supra note 10, 346 F.2d at 418 & n.13
 
 
 [13]
 We noted that the sponsor of the original § 8(b)(4), Senator Taft, had underscored the range of union campaigns outlawed by the statute and the difficulty of categorically defining them by remarking that "(o)ur committee heard evidence for weeks and never succeeded in having anyone tell us any difference between different kinds of secondary boycotts." Id. at 417-418 n.11 (quoting 2 Legislative History of the Labor-Management Relations Act at 1106 (1947) (emphasis by the Delta Steamship Lines court)). We also noted a statement of an opponent of the provision, Senator Pepper: "The Committee bill outlaws all kinds of so-called secondary boycotts, even when the objective of the boycott is to preserve wage and working condition gains already achieved by collective bargaining * * *." Id. (quoting 2 Leg. Hist. LMRA at 1108) (emphasis by the Delta Steamship Lines court)
 
 
 [14]
 The union attempts to distinguish the two NMU cases and the Shingle Weavers case on the ground that the union pressure against the neutral employers in those cases took the form of work stoppages which, the union suggests, are more coercive than consumer boycotts. But such a distinction is irrelevant to the issue for which the Board has properly invoked these cases the question whether the Board must show a primary labor dispute in holding union activity to be an illegal secondary activity
 
 
 [15]
 Although at one point the union appears to contend that the Board has wrongly contrived a "struck product" here to measure the union's conduct here against that of the union in Tree Fruits, union brief at 31-32, elsewhere the union makes clear its primary contention that its activity is protected under Tree Fruits, id. at 30
 
 
 [16]
 This distinction is important, since the union contends that the Board has wrongly assumed that Tree Fruits creates the only "exception" to the secondary boycott rule. According to the union, Tree Fruits does not declare illegal a consumer boycott which misidentifies the disfavored product but does not pose harm to the neutral's entire business. This is, of course, true, because the issue of the misidentified product did not arise in that case. But in our analysis here we are not determining whether the union's conduct in this case was identical to the union conduct held legal in Tree Fruits. Rather, we are invoking Tree Fruits as guidance in measuring the union's conduct against the statute
 
 
 [17]
 Of course, as a matter of congressional intent the simple fact that the union here is a "labor organization," 29 U.S.C. § 152(5) (1976), distinguishes its conduct from that of a general citizens group engaged in a "buy local" campaign. And the fact that the challenged conduct is a labor picket, and not some less coercive form of campaign, distinguishes this case from others where government regulation might raise constitutional problems. See NLRB v. Retail Store Employees Union, Local 1001, supra note 7, 447 U.S. at 613, 100 S.Ct. at 2376 (Stevens, J., concurring); Bakery & Pastry Drivers & Helpers Local 802 v. Wohl, 315 U.S. 769, 776-777, 62 S.Ct. 816, 819-820, 86 L.Ed. 1178 (1942) (Douglas, J., concurring)
 
 
 [18]
 The Board found that the picketers had exhorted customers to "(r)ead the label before you put it on the table," and had thereby implied that the customers were to reject soft drinks they discovered to be nonlocal. JA 430-431. The Board also found that picketers had urged customers not to buy "scab soda" and had booed customers who left the store with purchases of nonlocal soft drinks. Id
 We think it important to distinguish another context in which this evidence arose in order to demonstrate that the Board's findings were internally consistent. The Board rejected the General Counsel's arguments that the picketing breached the peace by overt coercive acts by the picketers, and so for that reason alone was not protected under Tree Fruits. JA 434-437. In so doing the Board held that the chanting and booing of the picketers had not disturbed the peace or constituted overt violent physical coercion of customers. JA 435 n.19. This finding is thoroughly consistent with the view that the chanting and booing nevertheless help demonstrate the object of the picketing.
 
 
 [19]
 The union seems to suggest that its conduct was legal because it did not intend a complete boycott of Monarch's retail business, including beer as well as soda. The union may well have lacked such intent: the language of the picket signs and handbills, as well as that of the chanting of the picketers, may prove no more than that the union sought a boycott of all nonlocal soda sold by the Monarch store. But the statute does not require the Board to prove such a broad intent. It requires only that one object of the picketing be to force the neutral employer to cease doing business with another person. 29 U.S.C. § 158(b)(4)(ii)(B) (1976). The union is not alone, however, in confusing these two elements of § 8(b)(4)(ii)(B). At one point in its brief the Board attempts to rebut the union's argument that the picketing had no observable coercive effect by asserting that the statute "only" requires proof of an unlawful object. NLRB brief at 24. This assertion is extremely misleading, since the Board must prove both that the union exhibited an unlawful object and that it "threaten(ed), coerc(ed), or restrain(ed)" the neutral, and, as we discuss infra, the latter element may include some measure of effect. See text and notes at notes 26-33 infra
 
 
 [20]
 Analogous to these misidentification cases are the so-called "merged-product" cases, where the struck product becomes physically integrated into the secondary's product along with nonstruck components. In these cases a union appeal to boycott the struck product is tantamount to an appeal to boycott the secondary's entire business, even if it precisely identifies the struck product. K & K Construction Co. v. NLRB, 592 F.2d 1228, 1231-1234 (3d Cir. 1979); American Bread Co. v. NLRB, 411 F.2d 147, 154-155 (6th Cir. 1969); Honolulu Typographical Union No. 37 v. NLRB, 401 F.2d 952, 954-955 (D.C.Cir.1968). These cases demonstrate that a boycott that fails to isolate the struck product is illegal even if the circumstances make it practically impossible for a well intentioned union to confine its campaign to that product. Thus the union could not successfully argue in this case that the great number of brands of soda and the failure of many of them to reveal clearly their place of manufacture make it impractical for the union to devise picket signs that help consumers distinguish all local from all nonlocal products
 
 
 [21]
 Reading Tree Fruits in combination with the recent decision in NLRB v. Retail Store Employees Union, Local 1001, supra note 7, we infer that a consumer boycott of a neutral business will "threaten, coerce, or restrain" the neutral if it either exceeds the scope of the union's primary campaign or will foreseeably cause "ruin or substantial loss" to the neutral
 
 
 [22]
 Of course, in the conventional secondary boycott situation the union can always continue its primary campaign on the site of the primary employer's business, whereas in this unusual case the union cannot in any practical sense carry out its "primary" campaign on the sites of the nonlocal manufacturers' businesses. This distinction, however, does not affect the applicability of the statute, which is concerned chiefly with the neutrality of the employer which the union is subjecting to pressure beyond that warranted by the primary campaign
 
 
 [23]
 It is, of course, an oddity of this sort of case that a misled consumer might boycott a local soda because he misidentified it as nonlocal and instead buy a nonlocal soda which he misidentified as local. The confusion in the union's message might thereby hurt the union's own interest at no net loss to the secondary business. On the other hand, the misled consumer might erroneously boycott one local soda but replace that purchase with one of another, properly identified, local soda and thus cause no net loss to the secondary. By contrast, in a case like Tree Fruits itself, had the picket signs failed to identify properly the struck Washington State apples, the misled consumer might have boycotted a product to which the union was wholly indifferent and caused a net loss to Safeway. We think, however, that such subtleties are irrelevant to the simple fact that the union's overbroad appeal here could cost the secondary sales of specific products misidentified local soft drinks which were not the target of the union's legitimate boycott campaign. Moreover, the union here could have foreseen that consumers would construe its appeal as calling for a boycott of all Monarch's soda. See text at note 32 infra
 
 
 [24]
 The Second Circuit, in Bedding, Curtain & Drapery Wkrs Union, Local 140 v. NLRB, 390 F.2d 495, 502 (2d Cir.), cert. denied, 392 U.S. 905, 88 S.Ct. 2056, 20 L.Ed.2d 1363 (1968), distinguished the similar case of NLRB v. Upholsterers Frame & Bedding Wkrs Twin City Local No. 61, 331 F.2d 561 (8th Cir. 1964), where the court held legal a picket with signs urging consumers to "Buy Mattresses Made Locally by Upholsterers Local 61, AFL-CIO." Id. at 562. That message, depending on its context, may not have been significantly clearer than the message on the signs in the present case, but, as the Second Circuit noted, the union in the Eighth Circuit case had passed out leaflets expressly listing the names of the manufacturers of the favored products. Moreover, the Board does not appear to have argued there that the signs were unclear. In any event, the Eighth Circuit made clear that Tree Fruits, which was handed down after the Board decision in that case, supplied the controlling law with respect to such boycotts. Id. at 564
 
 
 [25]
 Of course, some consumers might have construed the picketing, as reinforced by the chanting and booing, JA 424, 430-431, as urging a complete boycott of Monarch covering both soda and beer sales. Others might prefer to do "one-stop shopping" for both beer and soda and thus might have patronized another store even though they construed the union appeal as one only for a boycott of Monarch's soda. Nevertheless, we will assume that the picketing posed no harm to Monarch's nonsoda retail business
 
 
 [26]
 The Court found such a boycott similar to those in the so-called "merged product" cases. See note 20 supra
 
 
 [27]
 The union also ignores the Court's clear indication in Tree Fruits that the phrase "threaten, coerce, or restrain" does not describe any sort of measurable physical conduct suggested by the ordinary meaning of those words, but is rather a term of legislative art designed to capture certain types of boycotts deemed harmful by Congress:
 We come then to the question whether the picketing in this case, confined as it was to persuading customers to cease buying the product of the primary employer, falls within the area of secondary consumer picketing which Congress did clearly indicate its intention to prohibit under § 8(b)(4)(ii). We hold that it did not fall within that area, and therefore did not "threaten, coerce, or restrain" Safeway. * * *
 NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760 (Tree Fruits), 377 U.S. 58, 71, 84 S.Ct. 1063, 1070, 12 L.Ed.2d 129 (1964) (emphasis added).
 
 
 [28]
 Using figures supplied by the union, we infer that Monarch's potential loss from a complete boycott of its retail soda sales would be somewhat over $100,000 per year. Union brief at 8. Moreover, the Board heard some testimony that the picketing had caused Monarch a significant income loss. JA 55-57. Under its new mandate from the Supreme Court to determine whether a consumer boycott causes a secondary "substantial loss," NLRB v. Retail Store Employees Union, Local 1001, supra note 7, 447 U.S. at 615 n.11, 100 S.Ct. at 2377 n.11, the Board could conceivably find that the picket here violated the statute regardless of any misidentification of Monarch's products. Neither we nor the Board, of course, need reach that issue
 
 
 [29]
 This distinguishes the present case from NLRB v. Upholsterers Frame & Bedding Wkrs Twin City Local No. 61, supra note 24, in which the union's placards supporting "Home Industry" and products "Made Locally" were supplemented by leaflets setting out the names of local manufacturers from whom the consumers were encouraged to buy
 
 
 [30]
 The Board, of course, had evidence that even an experienced union business agent had difficulty distinguishing the local from the nonlocal soda. JA 427-428, 444 n.1. The union attempts to characterize the Board's proof as constituting only a few "isolated instances" of faulty product identification. If the union means thereby to suggest that the faulty identification of Coca-Cola, Pepsi-Cola, and Seven-Up products were "isolated instances," it is being extremely disingenuous, since those products represent an extremely large proportion of Monarch's total soft drink sales. See JA 427 n.12
 
 
 [31]
 The union contends that one Monarch customer, Philip Harris, who testified about his interpretation of the picket signs exhibited no confusion about the meaning of "local." Harris' testimony, however, actually supports the Board here. Harris conceded that he could not distinguish "local" from "nonlocal." JA 289. And he testified that he had never heard of Elmsford, New York and Purchase, New York, though these are two of the places of manufacture which a purchaser of Coca-Cola would have to identify as local. Moreover, he considered College Point, the Bronx, and New Rochelle to be nonlocal, though they are unquestionably local under the union's definition. JA 281-183
 
 
 [32]
 The Board's finding that the picketing was peaceful, and not rendered threatening or coercive by these incidents, is not inconsistent with a conclusion that the chanted messages could confuse consumers as to the scope of the union's boycott request. Cf. note 18 supra. In Tree Fruits, supra note 27, the union not only carefully identified the struck product in the message on its picket signs, but took other steps to ensure that sympathetic consumers would not take the boycott beyond the struck product. Thus the picket signs there also expressly informed the customers that the picket did not represent a strike against "any store or market," and the union gave written instructions to the pickets not to ask customers to cease patronizing the store. 377 U.S. at 60-61, 84 S.Ct. at 1064-1065. While the statute, of course, does not require such extra steps for a boycott at a neutral's business to be legal, these steps were available to the union in this case to help prevent consumer confusion about the scope of the boycott
 
 
 [33]
 The Board has demonstrated that it will examine the particular facts and circumstances of allegedly overbroad consumer boycotts and find for the union where consumers are not reasonably likely to misconstrue the union's message. Local 150, Chauffeurs, Teamsters & Helpers, 151 NLRB 734 (1965)
 
 
 [1]
 The majority opinion appears to uphold the Board's automatic assumption of jurisdiction over picketing by union members, at least until union picketers can overcome this presumption by demonstrating their compliance with the Board's "vague sign" test detailed in the majority opinion at text at notes 21-24 supra
 
 
 [2]
 Again in NLRB v. Retail Store Employees Union Local 1001, 447 U.S. 607, 613, 100 S.Ct. 2372, 2376, 65 L.Ed.2d 377, 48 U.S.L.W. 4796, 4798 (June 20, 1980), the Court reemphasized that § 8(b)(4) barred only the use of "secondary picketing calculated 'to persuade the customers of the secondary employee to cease trading with him in order to force him to cease dealing with, or to put pressure upon, the primary employer.' " (Emphasis supplied)
 
 
 [3]
 The opinion finds the necessary intent to force Monarch to cease dealing with another party the "boycott" in an affirmative request that the consumer buy products manufactured by the union. Indeed, any other interpretation of such a request is described as "disingenuous." To the contrary, I believe that in the absence of a labor dispute (see text at notes 4-10 infra (discussion of significance of labor dispute)) there is no basis at all in fact for the inference that a boycott of another party is what is "really" intended by an appeal to consumers to buy a certain product
 An affirmative request to buy cannot automatically be turned into a request to shun some other, unnamed product. Simply asking what the union wants may clarify the question; does it want the consumer to buy local soda (which is what its signs said) or not to buy non-local soda? The union's purposes would not be served at all were only the latter to occur; it has no interest in the economic well-being of non-local soda manufacturers and does not care at all whether they are "boycotted." The only consumer action which aids the union to achieve its goal of enhancing job opportunities would be an affirmative purchase of local soda. This picketing promoted local soda; it did not attack non-local soda.
 Construction of an intent to boycott non-local soda inferred from the union's affirmative appeal to purchase local soda also suffers from another flaw; there is no logical end to the products it thus identifies as intended by the union to be "struck." Certainly the union would be pleased if the sympathetic consumer spent money which might otherwise have been spent on non-local soda on a local one, but it would be just as pleased if the consumer decided, in response to the union appeal, to forego the week's six-pack of beer or for that matter, the twin-pack of chips or the carton of cigarettes and replace it with New York City-bottled Coke. Urging a purchase of one particular product, without more, is neither in intent nor necessary effect urging a "boycott" of another particular product. I do not think the administrative law judge or the Board gave this point any analysis at all. The administrative law judge relied solely on the "actions of the pickets (which) clearly showed that ... they were strenuously requesting the customers not to buy soft drinks manufactured out of the area." J.A. A-430. This was inferred from the chant "Read the label before you put it on the table" which the administrative law judge said "certainly implied that if the label disclosed it was bottled or canned in a non-local plant, it was to be rejected and not purchased." Id. But it could just as well have meant that the customer should look for a local label before purchasing any soda; an equally acceptable interpretation can be put on the pickets' shouting to keep tax dollars in New York and to shop the New York label, also relied on by the administrative law judge to show the union's object to make the retailer cease dealing with non-local suppliers. Id. The sole evidence of a direct intent to discourage business relations between the retailer and the non-local suppliers is gleaned from one incident on one afternoon during which pickets yelled "don't buy scab soda." J.A. A-430-31. Unless all positive appeals to buy particular products are to be construed as de facto negative appeals not to buy other products and so evidence of an unlawful object, I would find the evidence of such an object here very thin and "unsubstantial" indeed.
 
 
 [4]
 The chief authority relied on by the majority is this court's decision in National Maritime Union v. NLRB, 346 F.2d 411 (D.C.Cir.), cert. denied, 382 U.S. 840, 86 S.Ct. 90, 15 L.Ed.2d 82 (1965) (Delta Steamship Lines). This case dealt with the repercussions of a traditional labor dispute and involved a direct attempt by a union to draw an employer into a jurisdictional dispute between it and another union
 
 
 [5]
 Congress chose the phrase "labor disputes" in 1959 when it passed 29 U.S.C. § 164(c) to describe the totality of cases to which the Act applies. Section 164(c) provides:
 Power of Board to decline jurisdiction of labor disputes; assertion of jurisdiction by State and Territorial courts
 (c)(1) The Board, in its discretion, may, by rule of decision or by published rules adopted pursuant to subchapter II of chapter 5 of Title 5, decline to assert jurisdiction over any labor dispute involving any class or category of employers, where, in the opinion of the Board, the effect of such labor dispute on commerce is not sufficiently substantial to warrant the exercise of its jurisdiction: Provided, That the Board shall not decline to assert jurisdiction over any labor dispute over which it would assert jurisdiction under the standards prevailing upon August 1, 1959.
 (2) Nothing in this subchapter shall be deemed to prevent or bar any agency or the courts of any State or Territory (including the Commonwealth of Puerto Rico, Guam, and the Virgin Islands), from assuming and asserting jurisdiction over labor disputes over which the Board declines, pursuant to paragraph (1) of this subsection, to assert jurisdiction.
 (Emphasis supplied).
 Section 164(c) was intended to solve the "no man's land" problem, which arose because the Act had been held to preempt state control over matters covered by it. Since the Board sometimes refused to assert jurisdiction over cases when the employer involved was small, some cases were deprived of any forum at all. The particular problem with which § 164(c) was meant to deal is of no direct concern here, of course; the point is that when Congress wished to use a phrase to describe the entire jurisdiction of the Board, the phrase it chose was "labor dispute." See 1959 U.S.Code Cong. & Adm.News 2318, 2341, 2440, 2509 (legislative history).
 
 
 [6]
 See Delta Steamship Lines, 346 F.2d 411, 417 (D.C.Cir.), cert. denied, 382 U.S. 840, 86 S.Ct. 90, 15 L.Ed.2d 82 (1965). The union's conduct in Delta Steamship Lines was clearly coercive and, through a total work stoppage, intended to force an uninvolved employer to bring pressure on the rival union. The court pointed out the similarity of effect on a neutral employer between this situation and the classic secondary boycott one, 346 F.2d at 418, immediately before deciding that "Congress clearly desired to protect neutral employers from the ramifying effects of inter-union, as well as union-employer, strife." Id. Citation of a Second Circuit decision on the same facts, National Maritime Union v. NLRB, 342 F.2d 538 (2d Cir.), cert. denied, 382 U.S. 835, 86 S.Ct. 78, 15 L.Ed.2d 78 (1965) (Weyerhauser), is also telling. In Weyerhauser the Second Circuit concluded that there was in fact a "labor dispute," as defined by § 2(9). Id. at 541. See Lesnick, Job Security and Secondary Boycotts: The Reach of NLRA §§ 8(b)(4) and 8(e), 113 U.Pa.L.Rev. 1000 (1965). Cf. NLRB v. International Longshoremen's Union, 332 F.2d 992 (4th Cir. 1964) (Board has no jurisdiction under § 8(b)(4) in absence of a "labor dispute")
 
 
 [7]
 The Board's expertise in administering the Act and in recognizing industry patterns and practices would make such an analysis extremely valuable to the court
 
 
 [8]
 Congress clearly did not intend § 8(b)(4) to apply to all consumer picketing by a union. See, e. g., 105 Cong.Rec. 17899 (1959) (dialogue between Senators Kennedy and Goldwater re effect of § 8(b)(4) on union "buy-America" campaigns). The colloquy reads as follows:
 Mr. GOLDWATER: I have been asked by people who are vitally concerned whether there is anything in the conference report which would limit or prohibit the buy-America campaigns which are being carried on by certain unions and business groups, and even by some governmental bodies. I should like to ask the distinguished chairman of the conference committee whether the report was intended to have this effect. It is certainly my own conviction that no such effect was intended, either by the Senate or by the conferees.
 Mr. KENNEDY. I know that a good deal of effort has been made by some groups of workers, such as those who work on hats, to make sure that their working standards are protected. The answer to the Senator's question is no, it was not intended that the conference report have such an effect. I am glad that we have had the opportunity to establish legislative history in this matter.
 
 
 [9]
 Since the Board's action would regulate only some kinds of picketing (and thus picks and chooses permissible from impermissible communication based on its content), the legislation pursuant to which it is acting must be "finely tailored to serve substantial state interests," and "the justifications offered for any distinctions it draws must be carefully scrutinized." Carey v. Brown, 447 U.S. 455, 461, 100 S.Ct. 2286, 2290, 65 L.Ed.2d 263 (1980)
 Because I can find no clearly expressed Congressional intent to proscribe the picketing in this case, I do not discuss whether § 8(b)(4) meets the requirements which the first amendment places on statutes which impose burdens on free speech. However, I believe it would be very difficult to conclude on the facts of this case that § 8(b)(4) was a "finely tailored" statute designed to protect substantial and carefully justified state interests.
 
 
 [10]
 The few cases dealing with situations similar, in some regards, to this one do not give clear guidance. NLRB v. Upholsterers Local 61, 331 F.2d 561 (8th Cir. 1964), found no violation in consumer picketing by a union urging purchase of locally made mattresses. The court noted, but did not appear to place particular reliance on the fact, that the names of local mattresses were identified in handbills distributed by the picketers. Id. at 562-63. Bedding Workers Local 140 v. NLRB, 390 F.2d 495 (2d Cir.), cert. denied, 392 U.S. 905, 88 S.Ct. 2056, 20 L.Ed.2d 1363 (1968), involved picketing of retailers to buy only union label upholstery and bedding. The Board found and the Court affirmed (Kaufman, J., dissenting) that the picketing, though targeted at cutting off business with one particular bedding supplier with whom the union had a labor dispute, was unduly broad because the signs applied to furniture as well as bedding, and in fact many union made products in the store bore no union labels. The Court agreed with the Board that picketing in those circumstances was "aimed at inducing a generalized loss of patronage." Id. at 502. The same Court admonished that it was not deciding "whether 'union-label' secondary picketing alone could be held improper" or whether it would be a violation "if the object (was) to protect the jobs of members of Local 140 in other manufacturing plants." Id. at 503. NLRB v. Twin City Carpenters District Council, 422 F.2d 309 (8th Cir. 1970), upheld the Board's finding that pickets carrying signs outside a construction project reading, "Cabinets being installed on this job were not made by members of (local union)," id. at 309, constituted "an appeal to prospective customers to boycott Pemton's houses generally as a means of coercing Pemton not to buy Red Wing cabinets." Id. at 314. Compare Danielson v. Fur Dressers, Local 2F, 411 F.Supp. 655 (S.D.N.Y.1975) (picketing of company which imported foreign dressed skins to "Please Save Our Jobs, Don't Buy Argentine Dressed Fur Skins" held not a violation of § 8(b)(4) because picketed employer is not a true "neutral")
 
 
 [11]
 In that case, Judge Leventhal went on to say:
 When the pickets urge, either directly or by requests that render their meaning obvious, the entire boycott of the secondary establishment, they inject a new element. The restraint generated by the need to cross any such picket line may entirely inhibit consumers who are not whole-hearted union men but are unwilling to be readily identified as hostile or indifferent. There is no similar impact where the picketing acquiesces in the crossing of the picket line but merely urges that the consumer be selective on the inside. It is that sort of limited picketing message that Tree Fruits held outside the spirit of § 8(b)(4)(ii)(B).
 Id. at 957 (emphasis supplied).
 
 
 [12]
 The majority explicates at great length their reasons for finding that the pickets' actions "threatened, coerced or restrained" Monarch's trade. See majority opinion, text at notes 20-24 supra. However, I cannot give much credence to this discussion in light of the specific factual findings made by the administrative law judge about the non-threatening nature of their actions. His general conclusion as to the effect of the picketing was as follows:
 While General Counsel argues that the object of Respondent's picketing was to stop all trading with Monarch, I do not find that to be the case, nor does it affect my decision. There is no indicia from picket signs, handbills or oral communication that the Union sought to stop the sale of beer, which constituted 65 percent of Monarch's total sales. However, Respondent's picketing did seek to stop the sale of all soft drinks manufactured by Jem, Mack and other non-local suppliers, to Monarch, a yearly amount of about $800,000, and Respondent also wanted to shut off all trade between Jem, Mack and other non-local manufacturers who supplied the innocent secondary employer Monarch.
 J.A. A-439. He was unimpressed by evidence of the picketers' numbers, analogizing them to "cheerleaders ... chanting their rather mundane, if not corny slogans," and dismissed their booing as "a well recognized form of American speech." J.A. A-435. Though the administrative law judge recognized the isolated incidents of harassment detailed in the majority opinion, he also pointed out that in no instance had a customer actually been deterred from shopping at Monarch. J.A. A-436. As a matter of fact, he concluded that those incidents "point(ed) up the paucity of proof of any overt acts of restraint or coercion on the part of the pickets." Id. Finally, he noted that 11,828 customers shopped at Monarch in April, and another 14,198 in May, and yet never during that period of time had the store owner reported any harassment or voiced any complaints to the police about the pickets. Id.
 
 
 [13]
 I do not find that the record supports a conclusion that the purported vagueness in the picket signs posed any risk of harm to Monarch, see note 12 supra (conclusions of administrative law judge), much less the "ruin or substantial loss" required by Retail Store Employees. There may have been a few bottles and cans which were difficult to identify, but to the extent the union was successful in its appeal, consumer preference would simply shift to clearly-marked local soft drinks, at no loss to Monarch. The only way Monarch could lose sales due to lack of clarity about the struck product would be if a customer was sympathetic, but could not find any clearly-marked local soda, so decided not to buy any at all. There is nothing in the record to suggest that this did or could have happened, and I believe it wholly unsupported to suggest that Monarch's loss could have been as much as $100,000 per year. That could only occur if Monarch lost all of its retail soda business, a result which is contrary to what in fact happened, contrary to the union's appeal to the consumers, and contrary to common sense. After all, a union is only responsible for the "foreseeable consequences" of its actions. NLRB v. Retail Store Employees Union Local 1001, 447 U.S. 607, 614 n.9, 100 S.Ct. 2372, 2377 n.9, 65 L.Ed.2d 377 (1980). Retail Store Employees involved a boycott request of a product constituting over 90 percent of the neutral employer's business. In contrast, the retail store here constituted only 20 percent of Monarch's business, and 65 percent of that was beer. Thus, 100 percent of Monarch retail soda business was only 7 percent of its overall business. We have no way of knowing how disgruntled customers, frustrated at being unable to read a crimped bottle cap, refused to buy any soda at all, but it seems unlikely they constituted more than a small proportion of that 7 percent
 
 
 [14]
 Indeed, I can foresee the case in which the Board finds a sign "vague" because in order to fit in all the required information, it consists of long lists of products in small type, which a consumer would not stop and read and which he or she would be unable to carry into the store for further reference. Cf. NLRB v. San Francisco Typographical Union Local 21, 465 F.2d 53 (9th Cir. 1972) (copies of newspaper ads attached to picket signs held "too difficult to read")
 
 
 [15]
 Another irony inherent in what I perceive as the misapplication of § 8(b) (4) and the Tree Fruits analysis in this case is that the less closely tied to a particular dispute, and the more generalized the economic or political concerns of the union, the more difficult it will be for it to convey its message to the public without transgressing the strict requirements for identification of the "struck product." A union engaged in a traditional labor dispute (which was at least the focus of Congress' concern in passing the Act) can readily identify with precision the products which it wants the consumer to boycott; a union, like this one, attempting to communicate a more generalized, nebulous economic message would have trouble being as "precise" as the Board demands. The broader the concerns of the union and the further from the disruptive strife of a particular labor dispute, the more difficult this result makes communication of the union's concerns to the public
 
 
 [16]
 The Board and panel's analysis seems on its face to be inconsistent with the facts in Tree Fruits. There is not even a hint in the fact pattern in that case that consumers would be able to pick out Washington State apples unerringly, boycotting only those apples and none others. From personal experience, it is often difficult to identify the source of grocery store produce, and the result in that case could easily have been for the consumer to forego purchasing apples altogether. Furthermore, the pickets specifically identified one packer with whom they had no dispute, resulting, I expect, in sympathetic consumers buying apples identified as that packer's produce, especially if the non-Washington State apples were difficult to identify. Thus, on the facts as described in Tree Fruits, the likely result of the consumer picketing there held lawful would be precisely the same as that here. Some "confused" consumers would forego buying apples that week altogether, while others would buy only those which were clearly marked
 
 
 [17]
 Prior to the Supreme Court decision in Tree Fruits, the Board had consistently held all consumer picketing, including picketing of struck products, to "threaten, coerce, or restrain the retailer within the meaning of 8(b)(4)(ii)(B)." Goetz, Secondary Boycotts and the NLRA, 19 Kans.L.Rev. 700 n.246 (1971). We are almost back to that point; all consumer picketing by unions which is not approved as to content by the Board is now barred
 
 
 [18]
 See Honolulu Typographical Union Local 37 v. NLRB, 401 F.2d 952, 957 (D.C.Cir.1968) (held § 8(b)(4)(ii)(B) constitutionally permissible because "read as barring only picketing urging total consumer boycott, ... the statute strikes narrowly at those 'inherently compulsive features' present when consumers must cross a line") (emphasis supplied)